SIXTH DIVISION
JUNE 18, 2010

No. 1-09-2380

| | | |
|---|---|---|
| RONALD D. ATANUS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant | ) | Cook County |
| | ) | |
| v. | ) | No. 04 L 4934 |
| | ) | |
| AMERICAN AIRLINES, INC., and | ) | |
| PATRICK HARRINGTON | ) | Honorable |
| | ) | Brigid Mary McGrath, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiff Ronald Atanus commenced this tort action against defendants American Airlines, Inc. (American); Patrick Harrington, an employee of American; and S&C Electric Co. (S&C), which is not a party to this appeal. In his fourth amended complaint, plaintiff claimed that American committed "intentional interference with prospective advantages" and that Harrington committed "intentional interference with economic advantages," which we will analyze under the rubric of tortious interference with a prospective business expectancy, when Harrington allegedly made false statements about plaintiff to S&C. The trial court granted defendants' motion for summary judgment and this timely appeal followed. For the following reasons, we affirm.

BACKGROUND

On January 10, 2004, while working for American, plaintiff slipped and fell on a patch of ice and injured his back. Plaintiff then filed a workers' compensation claim with American, claiming that he was "totally disabled" for a period of 12 days from January 10, 2004, through January 22, 2004. In filing his claim, plaintiff spoke with Melanie Hall, a workers' compensation claims adjuster at Specialty Risk Services, which serves as American's third-party benefits administrator. Ms. Hall asked plaintiff whether he would like to include his wages from his second employer, S&C, as part of his workers' compensation determination of average weekly wage. Plaintiff declined and this triggered a red flag for Hall because, in her experience, employees who file workers' compensation claims would ordinarily include all of their earnings in order to receive the greatest possible benefit.

On January 20, 2004, Hall sent an e-mail to Michael Gerken, a loss prevention analyst at American, asking that he look into plaintiff's employment at S&C. Specifically, Hall wanted to make sure that plaintiff was not working for S&C during the time that he claimed he was "totally disabled" and entitled to workers' compensation benefits from American. Gerken, in turn, sent an e-mail to Patrick Harrington, a senior security representative at American, later that day and asked him to verify plaintiff's employment with S&C and basically determine the hours he worked there.

In compliance with Gerken's request, Harrington travelled to S&C to meet with Donna Badgett, their director of personnel services, on January 22, 2004. There Harrington confirmed that plaintiff was employed as a full-time engineer at S&C. In his deposition, Harrington

testified that he never told personnel from S&C that he was investigating workers' compensation fraud; instead, he merely stated that plaintiff had been injured while at work at American. Donna Badgett and John Rigo, an S&C security employee also present at Harrington's meeting with Badgett, both confirmed this in their depositions: Harrington never mentioned workers' compensation or workers' compensation fraud.

While confirming that plaintiff had not worked at S&C while he was claiming workers' compensation benefits at American, Harrington also learned that plaintiff's hours at S&C overlapped with those he was scheduled to work at American. According to S&C, plaintiff was scheduled to work for them between 8 a.m. and 4 p.m. on weekdays. Plaintiff was also scheduled to work full-time shifts at American that started as early as 2:05 p.m. on weekdays. In reporting on his visit to S&C, Harrington informed American that "[o]ther non-injury issues" arose out of the meeting and that he would continue to work with S&C to resolve those issues, namely the fact that plaintiff was scheduled to work for both companies at the same time during certain hours. Nothing in the record suggests that American instructed Harrington not to follow up on the timing issue or to avoid future contact with S&C in resolving the scheduling issue.

S&C did not require plaintiff to use a time clock to mark his comings and goings on the job, so Harrington decided to investigate American's records at O'Hare Airport where plaintiff worked in order to determine whether plaintiff was arriving on time for work at American. Harrington could look at two sets of records in order to discover whether plaintiff was arriving for work at American on time: time card records at the jobsite or gate access records at the entrance to American's employee parking lot at O'Hare. Harrington reasoned that the gate

3

records would be more accurate because an employee could have another employee sign in for him with the time card, but would have to personally present identification at the gate. Thus Harrington requested gate records from the City of Chicago, which operated the gate at O'Hare.

Upon receiving the gate records, Harrington determined that plaintiff was not arriving late to his shifts at American. After this point, American took no further action with respect to plaintiff's employment and plaintiff continues to work at American. Several weeks after Harrington's meeting with S&C, Donna Badgett contacted Harrington to request a copy of the gate access records. Harrington again contacted the City of Chicago and obtained another copy of the gate access records, which he then gave to S&C. Dennis O'Keefe testified at his deposition that the city has no restrictions on the use of this information or providing gate records to third parties; the information is not limited to specific uses upon release.[1]

On March 22, 2004, S&C management informed plaintiff that they were concerned that he was working at American during times when he was to be working at S&C, namely, between

---

[1] We note that the record and appellant's brief do not indicate O'Keefe's position or employer. Nor do they identify what O'Keefe and the deposer are speaking about in O'Keefe's deposition testimony. Since just a single page of the deposition testimony was included in the record, we can only assume that O'Keefe is the person who provided Harrington with the gate records and that he is talking about the gate records in the excerpted portion of his deposition. A full transcript of each deposition excerpted in the record was not made part of the record, nor was a table of contents filed for the voluminous record contrary to Supreme Court Rule 342(a) (210 Ill. 2d R. 342(a)).

8 a.m and 4 p.m. on weekdays. Because plaintiff did not have time card records of his comings and goings at S&C, they asked plaintiff to provide time card or other records from American to show that he was not working at American on S&C time. Plaintiff declined to do so. S&C then placed plaintiff on unpaid leave until he could provide them with the requested records, setting a final deadline in April 2004, after which S&C would consider plaintiff voluntarily terminated if he continued to refuse to provide records of his working hours at American. Plaintiff continued to refuse to provide the records and his employment with S&C terminated in April 2004. Plaintiff then filed this instant action.

Counts III and IV of plaintiff's fourth amended complaint are at issue in the case at bar. Count III, alleging "intentional interference with prospective advantages" against American, claims that

> "57. During the January 22, 2004, meeting, [American's] agent Patrick Harrington falsely stated to S&C management that [American] had reason to believe that [plaintiff] had committed worker's compensation fraud, and that [plaintiff] had been working less than his allotted hours at S&C in order to work at [American].
>
> 58. These false statements of [American's] agents regarding [plaintiff] were the proximate cause for the breach in [plaintiff's] employment relationship with S&C."

Count IV, alleging "intentional interference with economic advantages" against Patrick Harrington, claims:

> "66. During the January 22, 2004, meeting, Patrick Harrington falsely stated to S&C management that he had reason to believe that [plaintiff] had committed worker's compensation fraud, and that [plaintiff] had been working less than his allotted hours at S&C in order to work at [American].
>
> 67. These false statements of Patrick Harrington's regarding [plaintiff] were the proximate cause for the breach in [plaintiff's] employment relationship with S&C."

The trial court denied defendants' motion to dismiss counts III and IV of plaintiff's fourth amended complaint and allowed the parties to conduct discovery. After the close of discovery, the trial court granted defendants' motion for summary judgment on the grounds that plaintiff had failed to establish a genuine issue of material fact and that defendants were entitled to judgment as a matter of law.

ANALYSIS

Plaintiff appeals the trial court's grant of summary judgment for defendants, arguing that, despite what he pled in his complaint, he did not need to establish the transmission of untruthful information in order to survive summary judgment.

Summary judgment is appropriate where the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, when viewed in the light most favorable to the

nonmoving party, indicate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2008). We review a circuit court's decision on a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor, or by establishing "'that there is an absence of evidence to support the nonmoving party's case.'" *Nedzevkas*, 374 Ill. App. 3d at 624, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 275, 106 S. Ct. 2548, 2554 (1986). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

We find that plaintiff has failed to establish the required elements in order to prove tortious interference. As an at-will employee, plaintiff must plead tortious interference with a prospective business expectancy, rather than tortious interference with contractual relations. *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 510 (1991). A plaintiff claiming intentional interference with a prospective economic advantage must establish (1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectation,

(3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998); *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-407 (1996).

Plaintiff's main argument on appeal is that he is not required to establish that defendants transmitted untruthful information to S&C. However, that is exactly what plaintiff alleged in his complaint and thus is what he must establish in order to survive summary judgment. *Celotex*, 477 U.S. at 325, 91 L. Ed. 2d at 275, 106 S. Ct. at 2554. Plaintiff argues that the trial court erred in considering section 772 of the Restatement (Second) of Torts as informing the requirement that plaintiff plead and prove that defendants' intentional interference consist of transmitting untruthful information. Restatement (Second) of Torts §772 (1979) (Restatement). We do not believe that the trial court so erred.

While our supreme court has not explicitly adopted section 772 of the Restatement, it continues to look to the Restatement for guidance in outlining the contours of tortious interference actions. See *Dowd & Dowd*, 181 Ill. 2d at 485 (citing to section 766B of the Restatement for the proposition that a defendant's "intentional interference" with the plaintiff's business relationship must be "improper"); see also *In re Estate of Grace Ellis*, 236 Ill. 2d 45, 52 (2010) (citing to section 774B of the Restatement to explain the tort of intentional interference with an inheritance). Thus, the Restatement continues to be persuasive authority for this court. Defendants cite to *Soderlund Brothers, Inc. v. Carrier Corp.*, 278 Ill. App. 3d 606 (1995), as standing for the proposition that "[t]here is no liability for interference with a prospective

contractual relation on the part of one who merely gives truthful information to another."

*Soderlund Brothers, Inc.*, 278 Ill. App. 3d at 620, citing Restatement (Second) of Torts §772,

Comment *b*, at 50 (1979). Plaintiff objects to the use of this case because *Dowd & Dowd*,

decided the year after *Soderlund Brothers*, did not discuss liability for defendants whose alleged

interference consists of giving truthful information. This argument is unpersuasive because the

alleged interference in *Dowd & Dowd* had nothing to do with giving information; instead, the

defendants in *Dowd & Dowd* were accused of soliciting a major client from their former law

firm prior to their departure from the firm. *Dowd & Dowd*, 181 Ill. 2d at 471.

Furthermore, our supreme court has subsequently stated that giving proper and accurate

reports "cannot represent an unjustified interference." *Voyles v. Sandia Mortgage Corp.*, 196 Ill.

2d 288, 301 (2001). In *Voyles*, the plaintiff moved out of her home in downstate Illinois and

began residing in Naperville but retained ownership of her downstate abode, where plaintiff's

attorney subsequently moved in and assumed payments on plaintiff's mortgage. *Voyles*, 196 Ill.

2d at 290. Several years later, the servicer on plaintiff's downstate mortgage discovered an

increased assessment on the real estate taxes on the property and increased plaintiff's mortgage

payments to cover the consequent increase in property taxes. *Voyles*, 196 Ill. 2d at 290-91.

Despite repeated notifications of the increase from the mortgage servicer, plaintiff and plaintiff's

attorney refused to pay the increased amount, causing the mortgage servicer to commence

foreclosure proceedings against the plaintiff and report this fact to credit reporting agencies.

*Voyles*, 196 Ill. 2d at 291-93. Meanwhile, the plaintiff was attempting to refinance her mortgage

on the Naperville home when that mortgagee obtained a credit report noting the foreclosure

proceedings against plaintiff's downstate home. *Voyles*, 196 Ill. 2d at 293. When plaintiff's lawyer eventually paid the balance owed on plaintiff's downstate mortgage, the mortgage servicer reported this information to the credit reporting agencies and also notified the mortgagee on plaintiff's Naperville home. *Voyles*, 196 Ill. 2d at 293. The mortgagee on plaintiff's Naperville home subsequently refused her request to refinance because plaintiff had become unemployed. *Voyles*, 196 Ill. 2d at 293. Plaintiff filed suit against the mortgage servicer, alleging tortious interference with a prospective business advantage. *Voyles*, 196 Ill. 2d at 294. Focusing on the third element of tortious interference, our supreme court held that the plaintiff could not establish tortious interference where a defendant mortgage servicer provided accurate credit reports about the plaintiff to credit reporting agencies. *Voyles*, 196 Ill. 2d at 301. The court stated that providing "accurate and proper" reports could not constitute an unjustified interference with the plaintiff's prospective business expectancy. *Voyles*, 196 Ill. 2d at 301. This reasoning seems to indicate that where a business entity provides accurate and proper reports to another entity in a reasonable business transaction, providing those reports should not constitute intentional interference. Therefore, the trial court did not err in requiring plaintiff to establish that defendants' intentional interference consist of providing S&C with false—as opposed to truthful—information.

In addition, plaintiff has failed to establish the first element of tortious interference with a prospective business expectancy: a reasonable expectation of entering into a valid business relationship. *Dowd & Dowd*, 181 Ill. 2d at 484. Here, the business relationship in question is plaintiff's continued employment with S&C on the same terms under which he was employed

10

prior to January 22, 2004. In essence, plaintiff is claiming that American interfered with his right to work for two employers literally at the same time. The record establishes that plaintiff was to be working at S&C between the hours of 8 a.m. and 4 p.m. and also was scheduled to work shifts at American as early as 2:05 p.m. In other words, plaintiff's claimed expectation is that of defrauding his employer—working for American on S&C's time. As we have previously stated, "as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases." *Belden Corp. v. Internorth, Inc.*, 90 Ill. App. 3d 547, 552 (1980). Here, the business relationship that plaintiff claims is not enforceable. *Soderlund Brothers, Inc.*, 278 Ill. App. 3d at 616 (fraud is never enforceable).

Furthermore, plaintiff's expectation of continuing to work for two employers during the same hours is not reasonable. In his brief, plaintiff claims that his working hours at S&C were "flexible" and that as long as plaintiff put in 40 hours sometime during the work week, that was sufficient for a salaried full-time employee. However, Harrington's deposition testimony states that plaintiff's working hours at S&C were from 8 a.m to 4 p.m., and we were unable to find anything in the record to contradict that statement. A reasonable person would not assume that he could work for one employer during hours which he was scheduled to work for a second employer without receiving permission from the second employer. Accordingly, we find that plaintiff has failed to establish the first element of tortious interference with a prospective business expectancy.

Plaintiff has also failed to establish the third element of tortious interference with a prospective business expectancy. "The element of 'purposeful' or 'intentional' interference

refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy of entering into a valid business relationship with an identifiable third party." *Romanek v. Connelly*, 324 Ill. App. 3d 393, 406 (2001); *Dowd & Dowd*, 181 Ill. 2d at 485 (defendant must have committed "some impropriety" in order to satisfy the third element of tortious interference). Thus plaintiff must establish facts indicating that the defendants acted with the aim of interfering with plaintiff's expectancy of continued employment with S&C and that their actions were improper. He has not done so.

The course of events that transpired after plaintiff commenced his workers' compensation claim do not appear to be improper; rather, they seem reasonable under the circumstances. When plaintiff spoke with Melanie Hall, the claims adjuster for American, the fact that plaintiff did not want to include wages from his second employer—S&C—in his worker's compensation claim caused her to suspect that plaintiff might be working for his second employer while receiving workers' compensation benefits from American. It was reasonable and expected that American would send someone to S&C to investigate this possibility. The deposition testimony of Patrick Harrington, Donna Badgett, and John Rigo indicates that American's conduct during this investigation was professional and did not involve any malice or impropriety toward plaintiff. Once Harrington learned that plaintiff's working hours at American and S&C overlapped, it was again reasonable and expected that he would continue to investigate further to ensure that plaintiff was not working at S&C on American's time. Requesting gate access records at plaintiff's workplace was a reasonable method of

continuing that investigation. Once Harrington concluded that plaintiff was not arriving to work at American late, he concluded his investigation and plaintiff continues to work for American.

Plaintiff argues that the impropriety occurred when Harrington provided S&C with a second copy of the gate access records from plaintiff's workplace. However, we see nothing improper in this conduct. The gate records were true and accurate business records requested by S&C. When two employers discover that an employee is scheduled to work for both of them at the same time, it seems reasonable that one of those employers would share relevant records when asked by the other. Indeed, American did not volunteer these records once it discovered that plaintiff was arriving to work on time (and thus must have been departing early from S&C), but merely provided them upon request. We do not believe that this was unreasonable under the circumstances, and we certainly do not believe that defendants' conduct was improper. Thus, plaintiff has also failed to establish the third element of tortious interference.

We do not find any disputed issue of material fact in the case at bar. The only disputed issue of material fact that plaintiff explicitly identifies in his brief on appeal is whether or not Harrington mentioned a suspicion of workers' compensation fraud to S&C employees. Plaintiff testified in his deposition that Patrick Meyer, plaintiff's supervisor at S&C, "was alerted by Mr. Harrington of suspicion" of workers' compensation fraud. However, plaintiff could not recall whether Meyer spoke directly with Harrington. Plaintiff testified in his deposition that much of what he knew of S&C's meeting with Harrington and subsequent actions toward plaintiff came not from his own personal knowledge but rather from documents produced during discovery after the commencement of this litigation. In addition, plaintiff testified that he had no personal

knowledge that Harrington ever mentioned "workers' compensation" or "workers' compensation fraud" to S&C employees. Meyer testified in his deposition that he never met or spoke with Harrington. Because plaintiff has failed to establish the first and third elements of tortious interference and has not provided evidence to support the facts alleged in his complaint, we do not consider the question of the existence of the complained of statement to be an issue of material fact.

Plaintiff also argues that a jury should assess the credibility of the various witnesses to be presented at trial: presumably plaintiff, defendant Harrington, Donna Badgett, and Patrick Meyer. Again, plaintiff fails to highlight in his brief any issues of fact that would preclude granting summary judgment to defendants. Plaintiff claims that the jury must assess Harrington's credibility with regard to his motive in contacting S&C in the course of his investigation of plaintiff's workers' compensation claim with American. However, the deposition testimony of Harrington, Ms. Badgett, and John Rigo—the S&C security officer who was present during Harrington's meeting with Ms. Badgett—indicates that Harrington displayed no animus and did not appear hostile toward plaintiff. Plaintiff's sole argument that Harrington's conduct in investigating plaintiff's employment at S&C was improper is that American has been found liable for retaliation against other employees who have filed workers' compensation claims in the past. However, other than citing to those cases, plaintiff has presented no evidence that American has displayed any animus or impropriety in the instant case or has acted in any way other than a reasonable manner under the circumstances. Therefore, we do not find any issues of

material fact in the case at bar that would preclude a grant of summary judgment in favor of defendants.

Finally, plaintiff argues in his reply brief that he should be allowed to amend his fourth amended complaint to remove the requirement of transmission of false information and present another theory of tortious interference. Plaintiff raises this argument for the first time on appeal. Issues raised for the first time on appeal are waived. *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 306 (2000). Therefore we decline to address this argument.

CONCLUSION

Accordingly, for the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

CAHILL, P.J., and J. GORDON, J., concur.