2016 IL App (1st) 160651

Fifth Division
December 30, 2016

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| BULLET EXPRESS, INC., | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| v. | ) | |
| | ) | No. 14 CH 962 |
| NEW WAY LOGISTICS, INC., | ) | |
| | ) | The Honorable |
| Defendant-Appellant | ) | Brigid Mary McGrath, |
| | ) | Judge Presiding. |
| (Tom Stankiewicz, | ) | |
| Defendant). | ) | |
| | ) | |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. Justices Hall and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant appeal arises from the trial court's finding, after a bench trial, that defendant New Way Logistics, Inc., was liable to plaintiff Bullet Express, Inc., for tortious interference with a prospective economic advantage. The trial court's finding was based on defendant's conduct in picking up and refusing to deliver two cargo loads that plaintiff had hired defendant to deliver, which defendant did in an attempt to force plaintiff to pay defendant funds that plaintiff allegedly owed defendant for previous deliveries. Defendant appeals the

trial court's finding, as well as the trial court's imposition of punitive damages. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3                                    I. Complaint

¶ 4          On January 17, 2014, plaintiff filed a five-count verified complaint against defendant and Tom Stankiewicz,[1] defendant's principal. Plaintiff's complaint alleges that plaintiff was an Illinois corporation that "operated as an expedited long haul carrier utilizing independent contractors such as [defendant to deliver goods]. Under [plaintiff's] business model, [plaintiff] provides express and emergency transportation services of small, pallet-sized shipments or smaller for its customers that require immediate pick-up and delivery." On November 12, 2013, plaintiff and defendant entered into a lease agreement whereby defendant agreed to lease four vans to plaintiff and to provide drivers to transport shipments as dispatched by plaintiff.

¶ 5          On January 3, 2014, plaintiff received an emergency request from Bronco Freight Systems (Bronco) to transport a shipment from South Elgin, Illinois, to Eufala, Alabama, "with the express direction that the pallet be delivered at the destination on January 4, 2014 by 8:00 a.m. without fail." After receiving this request, plaintiff assigned the shipment to defendant for delivery via one of the vans leased to plaintiff. On the same day, defendant's driver picked up the shipment in South Elgin, Illinois.

¶ 6          Also on January 3, 2014, plaintiff received a request from Landstar Express America, Inc. (Landstar), to transport a shipment from Michigan City, Indiana, to Minneapolis,

---

[1] Stankiewicz's name is spelled "Stakiewicz" throughout the record, including in documents filed by defendant. However, at trial, when asked to spell his name, Stankiewicz spelled it "Stankiewicz." We use the spelling provided at trial.

Minnesota, "for immediate delivery." After receiving this request, plaintiff assigned the shipment to defendant for delivery via one of the vans leased to plaintiff. On the same day, defendant's driver picked up the shipment in Michigan City, Indiana.

¶ 7    However, "after picking up the Landstar Shipment and the Bronco Shipment, [defendant] refused to deliver the shipments as directed by [plaintiff] and, instead, took the Landstar Shipment and the Bronco Shipment hostage by keeping the two shipments at the parking lot outside [defendant's] location in Niles, Illinois." Stankiewicz, defendant's principal, supplied the purported reason for keeping the shipments on January 4, 2014, when he contacted plaintiff "and demanded that [plaintiff] pay [defendant] over $25,550.00 for services performed under the [lease agreement] despite the fact that [defendant] had only performed $19,019.81 of services and despite the fact that its payments were not yet due under the Agreement." The complaint alleges that the past November, plaintiff had received a "Notice of Assignment," which directed it to forward all payments due to defendant to a bill factoring company. Plaintiff had forwarded two payments to the factoring company, but was later informed that the factoring company had "misplaced the payments," meaning that plaintiff had not received credit. Plaintiff "informed [defendant] that it was ready[,] willing[,] and able to replace the checks but, instead, Defendants commandeered the two shipments."

¶ 8    On January 4, 2014, plaintiff informed defendant that the two shipments had a value of $78,000 and $200,000, respectively, "and that they needed to be delivered immediately or [plaintiff] would lose Landstar and Bronco as customers." However, "despite [defendant's] actual knowledge that its decision to hold the two expedited shipments subjected [plaintiff] to substantial liability and the likely loss of its customers Bronco and Landstar, [defendant] persisted in its intentional decision to hold the Bronco Shipment and the Landstar Shipment

hostage." The complaint alleges that, on information and belief, the two shipments remained on defendant's vans as of the date of the filing of the complaint.

¶ 9    The complaint alleges five counts against defendant and Stankiewicz, its principal, including counts for replevin, breach of contract, a temporary restraining order, and conversion.[2] However, only count V, for tortious interference with a prospective economic advantage, is at issue on appeal and, accordingly, that is the only count we discuss herein.

¶ 10    Count V alleges that as of January 3, 2014, plaintiff "had enjoyed a continuous business relationship with Landstar for over seven years and had developed personal relationships with several representatives of Landstar." Similarly, as of January 3, 2014, plaintiff "had enjoyed a continuous business relationship with Bronco and had developed personal relationships with several representatives of Bronco."[3] Count V alleges that plaintiff "reasonably expected to continue a valid business relationship with Bronco and with Landstar," and further alleges that defendant and Stankiewicz were aware of plaintiff's reasonable expectancy of continuing the relationships with the two companies. Nevertheless, "[defendant] and Tom Stakiewicz [*sic*] purposefully interfered with [plaintiff's] legitimate expectancy to continue its valid business relationships with Bronco and with Landstar by intentionally and without legal or contractual justification holding the Landstar Shipment and the Bronco Shipment hostage." As a result, "[plaintiff] has and will continue to suffer damages resulting from [defendant's] and Tom Stakiewicz's [*sic*] wrongful actions."

---

[2] The record on appeal contains an order indicating that plaintiff voluntarily dismissed the counts concerning conversion and for the temporary restraining order. However, the parties proceeded to trial on the counts for breach of contract, conversion, and tortious interference, indicating that it was the replevin count, not the conversion count, that was voluntarily dismissed.

[3] While count V concerns both Landstar and Bronco, at trial, plaintiff's counsel indicated that "we are going to focus mainly on" Landstar.

Accordingly, count V sought compensatory damages in excess of $50,000, punitive damages, and attorney fees and costs.

¶ 11    On January 21, 2014, defendant filed an answer and counterclaim, in which defendant admitted to being assigned the two shipments and picking them up. Defendant further admitted "that [defendant] initially declined to deliver the shipments because of [plaintiff's] breach of contract[.]" Defendant also admitted "that on January 3, 2014 Krzysztoy [*sic*] Stojkowski[4] demanded payment of those amounts due, that [plaintiff] promised that it would make the payments, [and] that [plaintiff] has not made the payments due in breach of the parties' contract[.]" Defendant denied that plaintiff informed it of plaintiff's relationships with Bronco and Landstar and that it would likely lose those customers as a result of defendant's actions. Defendant also denied that the shipments remained on its vans.

¶ 12    Defendant's counterclaim, which is not at issue on appeal, alleged that on November 12, 2013, plaintiff and defendant entered into a lease for the transportation of goods in interstate commerce. Defendant alleged that it had "fully performed its obligations under the terms of the Lease and has billed [plaintiff] the sum of $28,598.88." However, "[plaintiff] has failed to pay for the services rendered by [defendant] in material breach of the Lease." Accordingly, the counterclaim sought damages in the amount of $28,598.88.

¶ 13    II. Trial

¶ 14    The matter proceeded to a bench trial, which was conducted on June 16 and June 17, 2015. Since the only issues on appeal concern the count for tortious interference and the award of punitive damages, we focus primarily on those facts and relate other facts as needed to provide context. As noted, while the complaint contains allegations concerning both

---

4 Stojkowski is defendant's owner.

Landstar and Bronco, at trial, plaintiff's counsel indicated that "we are going to focus mainly on" Landstar.

¶ 15                                1. Sonja Jovanovic-Calasan

¶ 16        Sonja Jovanovic-Calasan testified that she is the owner of plaintiff, a company she founded in October 2007 as an expedited carrier. She founded the company with her ex-husband and, when the marriage dissolved, Jovanovic-Calasan realized that she "couldn't do it all by myself," so she hired George Ilibasic to work with her. She explained that the company transported "like 96 percent" automobile parts, and that the company was penalized if it was not on time with its pickups and deliveries.

¶ 17        Jovanovic-Calasan first became aware of defendant in October 2013 when Stankiewicz called her and offered her the use of 10 sprinter vans. She informed him that plaintiff did not have enough work for 10 vans, and testified that "[h]e had absolutely no experience whatsoever, so I was a little hesitant." Nevertheless, she decided to hire four vans. Stankiewicz came to Jovanovic-Calasan's office in November 2013 for a meeting with her and Ilibasic, where Jovanovic-Calasan explained the business to Stankiewicz. Jovanovic-Calasan testified that she "emphasized how important every single shipment is for our customers. So it's all expedited. I need to know at every single time when the driver is at the pickup, when he is loaded with pieces waiting, [bill of lading (BOL)] number, when he arrives at the shippers, at the consignee, who signed for the freight. *** We track our shipments every hour on the hour for our customers, and our customers get email alerts stating where their shipment is. This is how important the shipment is in every single shipment that we haul. That's what I went through with him." Stankiewicz indicated that he understood.

¶ 18       Jovanovic-Calasan testified that at the beginning, she dispatched shipments to defendant personally "just because they had no experience, so I wanted to make sure everything is done correctly." In dispatching shipments to defendant, Jovanovic-Calasan communicated only with Stankiewicz because defendant's drivers did not speak English and Jovanovic-Calasan did not speak Polish. When she dispatched a shipment, she would do so via text message, communicating the details of the shipment. Once Stankiewicz received the text message, he was required to text back that he received the message, as well as another message when the driver arrived at the pickup location and when he was loaded. Jovanovic-Calasan explained that the moment that the driver arrived, she was required to call the customers and inform them that the driver was there "[b]ecause it's an expedited shipment. It's a very important shipment. It's something that needs to go fast, and that's all we have been doing for seven years, that's all I have ever done is expedited freight."

¶ 19       Jovanovic-Calasan testified that she left to visit her brother in Serbia on December 24, 2013, and returned on January 6, 2014. Before she left, she informed all drivers, including Stankiewicz, that she was leaving and the length of her trip. While she was away, Ilibasic was in charge. During her trip, she was awakened by a message from Ilibasic, who informed her that defendant was "saying that they never received any payment and that they are holding the freight because of nonpayment." Prior to this, Jovanovic-Calasan had not been aware that there was any payment issue with defendant.

¶ 20       Jovanovic-Calasan contacted Stankiewicz immediately and communicated with him through text messages, copies of which were admitted into evidence without objection. One of the text messages from Stankiewicz was dated January 4, 2014, and stated, in part: "Kris wanted to hold on to cargo over a week ago but I stopped him." Jovanovic-Calasan testified

that she did not know "Kris" at the time but later learned that "Kris" was Stojkowski, Stankiewicz's partner. Prior to January 4, defendant had never threatened to hold a load hostage and Jovanovic-Calasan was not aware that defendant was going to attempt to do so. Jovanovic-Calasan's reply to Stankiewicz was: "But Tom WHY would you do that??? You know I'm coming back on [January 8]."

¶ 21 A later text from Stankiewicz, also dated January 4, stated: "I will not but [K]ris will contact those companies from BOLs tomorrow for sure. To let them know why he kept the cargo. Just a heads up." Upon receiving this text, Jovanovic-Calasan's understanding was that she was being threatened that defendant was going to contact her customers, Landstar and Bronco, whose shipments were being held by defendant. Stankiewicz provided her with Stojkowski's phone number, and Jovanovic-Calasan called Stojkowski and asked him to deliver the freight. She told him that she would be back that Monday and would wire the money that defendant claimed it did not receive. Jovanovic-Calasan testified that "[h]e said, 'No. Either you have three options: One, you wire me 27,000,' I think it was; 'two, you give me the title to your car; or three, I see you in court.' Well, I took option No. 3. I had no other option to take. It was Friday night. I can't wire anything on a *** Friday night. I can't wire anything on a Saturday. I can't wire anything on a Sunday. So it was out of my control. They waited for Friday night to take this load hostage, where I could not do anything until Monday morning."

¶ 22 Jovanovic-Calasan contacted Jonathan Hauger from Landstar to inform him of the delay; she testified that "Jonathan Hauger has been one of our customers for the past six years. We had a great relationship, talked constantly on the phone. So I wanted to let him know what was going on with this freight, since that freight was supposed to have already been

delivered." Jovanovic-Calasan called Hauger "maybe 20 times" about the held load. She discovered that the shipment was eventually delivered and called Hauger to advise him of that; she never had another conversation with Landstar after that.

¶ 23 Jovanovic-Calasan testified that Landstar became plaintiff's customer in March 2008 and was a consistent customer until January 2014. She testified that "[w]e had a great relationship. We never had any issues or problems whatsoever." In the two years prior to January 2014, plaintiff had transported over 100 loads for Landstar, and between March 2008 and 2012, plaintiff had consistently transported approximately 50 loads a year for Landstar. During the six years that plaintiff provided service for Landstar, there were no gaps in which plaintiff stopped handling Landstar shipments, nor were there any disputes during that time; plaintiff was never late on any Landstar deliveries. Records of the shipments plaintiff delivered for Landstar in 2012 and 2013 were admitted into evidence over defendant's objection.[5] These records showed that in 2012, plaintiff's profit from Landstar shipments was $23,392.87, and its 2013 profits were $21,748.72.

¶ 24 After the incident, Jovanovic-Calasan attempted to contact Landstar "[n]umerous times" because "we had such a great relationship, and I did not want to lose them as a customer whatsoever, so I tried to talk to them and see what we could do to get back the business from them, but I never got any emails back. I sent emails numerous times, calls. Never nothing." Since the incident, plaintiff had not delivered any shipments for Landstar.

¶ 25 Jovanovic-Calasan testified that she had expected that plaintiff would continue to provide service to Landstar for a number of years; she testified that "I never expected to lose that

---

[5] Defendant's objection was based on the fact that plaintiff claimed to have a six-year history with Landstar, but based its damages calculations on the two years of records it had available. Defense counsel argued that he could not effectively cross-examine Jovanovic-Calasan concerning the amount of damages without those additional records. However, the damages calculation is not at issue on appeal.

client ever. There was no reason for us to lose him." Prior to the incident, "[w]e received a lot of calls from Landstar Denver office to cover their freight, their shipments, and ever since that happened we never received another call from them at all, never ***. We do still get their emails. We are not taken off the email list, but every time I reply, we never get any responses or anything like that."

¶ 26    She testified that "Landstar was one of our biggest customers from the sprinter loads, and because of *** what had happened, we did lose that Denver agent for Landstar, and this financial whole situation with lawyer costs, everything put us in a burden, so we had to change and rearrange our policy of doing freight differently."

¶ 27    On cross-examination, Jovanovic-Calasan testified that the text messages dispatching deliveries did not contain information identifying the customer. She further testified that plaintiff was not guaranteed any amount of business from Landstar and Landstar was free to stop using plaintiff anytime it chose to do so. On redirect, Jovanovic-Calasan reiterated that during the six years it had been a customer, Landstar had never had any periods in which it stopped using plaintiff as a carrier.

¶ 28                    2. George Ilibasic[6]

¶ 29    George Ilibasic testified on plaintiff's behalf that he worked at plaintiff as a dispatcher in late 2013 and early 2014, assigning plaintiff's drivers deliveries. At that time, plaintiff had 38 drivers, approximately 10 of whom Ilibasic would dispatch personally; the rest would be dispatched by Jovanovic-Calasan. Ilibasic testified that plaintiff's drivers were informed that plaintiff delivered expedited freight that needed to be delivered as soon as possible.

---

[6] Ilibasic was technically plaintiff's first witness, due to his availability.

¶ 30        Ilibasic testified that the relationship between plaintiff and defendant began in November 2013, and that he was present for the initial meetings between the two, along with Jovanovic-Calasan and Stankiewicz, defendant's agent. Stojkowski, defendant's owner, was not present for the meetings, and Ilibasic had never met him in person but had only spoken with him over the phone. At the first meeting, Jovanovic-Calasan explained the way that plaintiff operated to Stankiewicz, which included an explanation that plaintiff was delivering expedited freight that needed to be delivered as soon as possible.

¶ 31        Ilibasic testified that when he dispatched shipments to defendant, he did so through Stankiewicz, who was the only person Ilibasic dealt with at that company. Ilibasic explained that when a shipment came in, "we would take the shipment information immediately, and we would send it to [Stankiewicz] via text message. *** [W]e would send the mileage, how long of a run it was, where the pickup was, where the destination was, if there was any contact that had to be contacted there." If there was a "dire need for the commodity to be picked up immediately" and Stankiewicz did not respond, Ilibasic would call him to find out the driver's status.

¶ 32        Ilibasic testified that on January 3, 2014, Jovanovic-Calasan was out of the country, and he was "dealing basically with day-to-day business" himself. He received a phone call from Stankiewicz in the morning, indicating that two of defendant's vans were available for deliveries, and within an hour and a half, Ilibasic had shipments for both—one for Bronco and one for Landstar. After the shipments were picked up, Ilibasic received an update from Stankiewicz at approximately 4 p.m. and was "texting back and forth" with him.

¶ 33        At approximately 8:30 p.m., Ilibasic received a phone call from Stojkowski "basically stating that he was going to take the freight hostage unless we paid him $27,000 immediately

or if [Ilibasic] could give him [Jovanovic-Calasan's] Mercedes as collateral." This was the first time that Ilibasic had ever spoken with Stojkowski, as all of plaintiff's communications with defendant were through Stankiewicz. Ilibasic was at a restaurant at the time, and provided the restaurant's fax number to Stojkowski for him to send the invoices; Stojkowski faxed "a roll of register tape with just a bunch of numbers on it, which added up to $27,000." Ilibasic immediately tried to contact Jovanovic-Calasan, but she was in Serbia, in a remote area in which she did not have an internet connection. Ilibasic was not able to speak with her until approximately 1:30 a.m. on the morning of January 4.

¶ 34    Ilibasic testified that Landstar was one of plaintiff's top five customers. However, after this incident, plaintiff "lost all business with Landstar." Ilibasic attempted to call Landstar and spoke with several dispatchers, as well as Jonathan Hauger, who was "the top guy there," about the delivery issue. He called Landstar on January 8 or 9, after the shipment had been delivered, and informed Hauger of that fact. Plaintiff later attempted to obtain new shipments from Landstar, "but [Hauger] wouldn't deal with us anymore."

¶ 35    On cross-examination, Ilibasic testified that plaintiff did not have a contract with Landstar and dealt with Landstar on a load-to-load basis. Ilibasic also testified that when defendant's driver picked up the Landstar shipment, he would have been given the bill of lading; the bill of lading did not contain Landstar's name and the shipment was not delivered to Landstar. Ilibasic further testified that the text message did not indicate that the shipment was a Landstar shipment.

¶ 36                                    3. Tomasz Stankiewicz

¶ 37        Plaintiff also called Tomasz Stankiewicz, the general manager of defendant at the time of the incident, as a witness[7] on plaintiff's behalf; Stankiewicz explained that while he was defendant's general manager, he referred to himself as a "partner" with Stojkowski, defendant's owner, when dealing with plaintiff. Stankiewicz testified that part of his job was to communicate with Jovanovic-Calasan and Ilibasic and to receive their dispatches; Jovanovic-Calasan and Ilibasic never spoke to defendant's drivers.

¶ 38        Stankiewicz testified that he "understood very well" that plaintiff handled expedited shipments and that it was "especially important" that those shipments be delivered on time. Stankiewicz was also familiar with the two shipments that were held by defendant and was the one who communicated to plaintiff that the loads would not be delivered. Stankiewicz testified that he was not the person who made the decision to hold the loads, but he agreed with the decision; Stojkowski was the one who decided that "the shipment isn't going anywhere until we get paid."

¶ 39        Stankiewicz testified that a week before the incident, Stojkowski had mentioned wanting to hold a load hostage to try to get the payment defendant believed it was due. However, Stankiewicz testified that "he had this idea a week earlier, he didn't do it, and I pretty much forgot about it."

¶ 40        Stankiewicz testified that at the time defendant's drivers picked up the two loads, he was unaware that they belonged to Landstar and Bronco, but Ilibasic informed him of that fact when Stankiewicz contacted him to inform him that the shipments would not be delivered. Plaintiff's counsel showed Stankiewicz his deposition testimony in which he testified that he

---

[7] The trial transcript does not reflect that Stankiewicz was expressly called as an adverse witness, but simply states that he was called "as a witness *** on behalf of the Plaintiff."

knew that the loads belonged to Landstar and Bronco when defendant held them, but at trial, Stankiewicz testified that he learned that information only after the loads were picked up.

¶ 41    Stankiewicz was also asked about his text message to Jovanovic-Calasan in which he told her that Stojkowski was going to contact plaintiff's customers:

> "Q. You told her that you were going to—[Stojkowski] was going to contact the customers on the loads?
>
> A. Okay.
>
> Q. Is that right?
>
> A. That would be [the] wise thing to do; right?"

However, Stankiewicz denied contacting Landstar or Bronco and testified that "we didn't contact the customer. [The] [c]ustomer contact[ed] us." Stankiewicz also disagreed with plaintiff's counsel's characterization of his statement as a "threat" to contact plaintiff's customers, testifying that it "would be [a] wise thing" to have a conversation with Jovanovic-Calasan "about the consequences of [plaintiff's] actions."

¶ 42                              4. Krzysztof Stojkowski

¶ 43    Finally, plaintiff called Krzysztof Stojkowski, defendant's owner, to testify on plaintiff's behalf.[8] Stojkowski testified that Stankiewicz dealt with plaintiff on a day-to-day basis for dispatching, while an individual named Adam Gonzalez[9] dealt with plaintiff concerning billing; Stojkowski did not have any personal interaction with plaintiff prior to January 4, 2014. Stojkowski testified that he was aware that plaintiff's loads were expedited, meaning

---

[8] As with Stankiewicz, the trial transcript does not reflect that Stojkowski was expressly called as an adverse witness, but simply states that he was called "as a witness *** on behalf of the Plaintiff."

[9] Stojkowski testified that Gonzalez was not an employee of defendant but was an employee of Pol Credit, another company that Stojkowski owned.

that it was cargo that could not be delayed; he knew that "if an expedited load is late, that would have big problems, not just for [plaintiff] but for [plaintiff's] customers as well."

¶ 44    Stojkowski testified that by January 4, defendant had a "big problem" with receiving payment from plaintiff. Due to this perceived payment issue, on January 3, Stojkowski personally made the decision not to deliver two shipments on time. Stankiewicz instructed the drivers to drive to defendant's office, and Stojkowski took their keys and possession of both sprinter vans. Stojkowski testified that while he now knew that the loads belonged to Landstar and Bronco, he did not know the identity of the customers at the time defendant picked up the shipments.

¶ 45    Stojkowski testified that he knew that Landstar was the customer on one of the loads by January 7, because he spoke to Jonathan Hauger of Landstar. Stojkowski testified:

> "I told him that I am in possession of the load, but I do have that load because we have a dispute of payment, that I didn't get paid for over 60 days. At that time it was like 65 days. First invoice was never paid. So I said, 'I am holding the load.' "

According to Stojkowski, Hauger informed him that defendant could go through plaintiff's insurance company to recover any payments it was owed and Stojkowski then decided to deliver the load.

¶ 46    Stojkowski testified that since the incident, defendant had transported several loads for Landstar directly. At the time of the incident, defendant had recently signed an agreement to transport cargo for Landstar and Stojkowski testified that he did not want to jeopardize that relationship:

> "[A] month and a half earlier we [had] already signed an agreement with Landstar. That [was] when I [found] out this is a Landstar company.

And this is a Landstar agent that is calling me and telling me that I can get paid from the insurance company, so of course I don't want to jeopardize [a] future relationship with this company, when I just signed a contract, but by then we didn't even [deliver] the one load yet for Landstar.

Q. You knew that a failure to deliver this particular load would jeopardize a relationship with Landstar?

A. With the company of Landstar, it's a very good possibility. I am not sure what the consequences [were], but at that time, like I told you before, since Landstar told me I can get paid from her insurance company, I decided to deliver the next day.

Q. Are you saying that you didn't understand that a failure to deliver the shipment would jeopardize a relationship with Landstar?

A. Yes, I did understand that."

However, Stojkowski testified that he "[didn't] know" whether a failure to deliver the load would jeopardize plaintiff's relationship with Landstar as well.

¶ 47    Immediately after this testimony, plaintiff rested and defendant began its case in chief by calling Stojkowski as its first witness. He testified that by the end of December 2013, defendant had not been paid anything by plaintiff and was owed approximately $27,000. He decided that he would hold the two loads from plaintiff until defendant was paid. At the time, he was unaware of the identity of plaintiff's customers.

¶ 48    On cross-examination by plaintiff's counsel, Stojkowski testified that he was informed after he took possession of the loads that one of them belonged to Landstar.

¶ 49                                    E. Trial Court Order

¶ 50         On September 30, 2015, the trial court entered judgment in favor of plaintiff and against

defendant on plaintiff's complaint in the amount of $64,141.58, consisting of $45,141.58 in

lost profit damages and $22,000 in punitive damages.[10] The court entered judgment in favor

of defendant and against plaintiff on defendant's counterclaim in the amount of $28,922.16,

consisting of $26,597.60 in unpaid invoices and $2,324.56 in prejudgment interest. After

subtracting the two numbers, the court entered a net judgment in favor of plaintiff and against

defendant in the amount of $38,219.42.

¶ 51         The court stated that its judgments were based on the following findings of fact and

conclusions of law, stated in open court. The court found defendant liable for breach of

contract, conversion, and tortious interference with a prospective economic advantage. With

respect to the count of tortious interference, the court found that plaintiff demonstrated that it

had a reasonable expectation of entering into future contracts for shipment with Landstar

even though it had no underlying contractual relationship with Landstar. The court found that

plaintiff's witnesses had testified that plaintiff had enjoyed a prosperous six-year relationship

with Landstar and was retained to transport Landstar shipments on a regular basis; the court

further found that plaintiff had introduced evidence that plaintiff handled over 100 loads for

Landstar over the two-year period prior to January 2014 and that "[t]he fact that the Plaintiff

and Landstar did not have a formal contract doesn't void a cause of action. All that is

required is that the Plaintiff establish a reasonable expectancy of entering into a valid

business relationship, which the Plaintiff has done."

_____

[10] The court also entered judgment in favor of Stankiewicz on all counts of plaintiff's complaint relating to him.

¶ 52    The court found that defendant knew of plaintiff's expectancy, finding that "[a] defendant need not have knowledge of the specific details of a plaintiff's respective business relation, and Illinois courts have held it to be sufficient where a defendant had a general knowledge of the plaintiff's business relationships and not knowledge of specific customers or the nature of the relationship." The court noted that defendant admitted that it knew that shipments were time-critical and that delivering a shipment late could result in significant problems. The court found that Stankiewicz testified that he learned that one of the loads belonged to Landstar on January 3, when he spoke with Ilibasic. The court further found that Stojkowski "knew it was Landstar *** by January 3 at the latest, and that was underscored by the fact that he actually had telephone conversations with Landstar's agent."

¶ 53    The court also found that plaintiff had established by a preponderance of the evidence that defendant intentionally interfered with plaintiff's relationship with Landstar. The court found that "[b]y January 4, 2014 the Defendant threatened to contact the customer for whom the shipments were to be made to let them know why Defendant was refusing to deliver them. [Stojkowski] subsequently did just that, telling Landstar through its Agent, Jonathan Hauger that Defendant was refusing to deliver the shipment because it hadn't been paid."

¶ 54    Finally, the court found that the evidence established that "it was more likely than not *** that as a result of the Defendant refusing to deliver the shipments to Landstar and telling Landstar that Plaintiff hadn't paid them that Landstar never did business with Plaintiff again." The court awarded plaintiff lost profits over a two-year period amounting to $45,141.58, based on the two years of records that it had submitted; the court noted that plaintiff had asked for six years of lost profits, based on its six-year history with Landstar, but the court found that there was no documentation as to the earlier four years.

¶ 55      The court also awarded plaintiff punitive damages in the amount of $22,000, which it noted were appropriate in cases in which the defendant acted willfully or with such gross negligence as to indicate a wanton disregard for the rights of others. With respect to punitive damages, the court found:

>           "The evidence established the following:
>
>           The Defendant through its agents knew that the principal of the Plaintiff was leaving the country on or about December 24.
>
>           Up to that point in time the Defendant also knew it had not provided bills of lading in support of all of its deliveries and that Plaintiff was under an obligation to pay Defendant's Agent, Trans Am, yet demanded direct payment in any event.
>
>           Defendant also knew the damages Plaintiff would incur if shipments were delayed, and notwithstanding all of this the Defendant intentionally kept two shipments hostage.
>
>           Based on the willful nature of the Defendant's action the Court awards punitive damages in the amount of $22,000. Finding this to be an appropriate award based on all the evidence."

¶ 56      On October 30, 2015, defendant filed a motion to reconsider, which was denied, and this appeal follows.

¶ 57                                    ANALYSIS

¶ 58      On appeal, defendant raises two issues. Defendant first argues that the trial court erred in entering judgment against it on the tortious interference. Defendant also argues that the trial court erred in awarding plaintiff punitive damages. As an initial matter, defendant asks this court to review these issues *de novo*, arguing that it is the application of the witnesses'

testimony to the law that is at issue, not the testimony itself. However, defendant provides no support for this argument. The only case defendant cites is *Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 5 (2007) (quoting *Redmond v. Socha*, 216 Ill. 2d 622, 633 (2005)), which simply provides that " '[a] standard of review applies to an individual issue, not to an entire appeal. Each question raised in an appeal is subject to its own standard of review.' " Accordingly, as we did in *Matthews*, we discuss the standard of review for each issue in our analysis of that issue.

¶ 59                                    I. Tortious Interference

¶ 60        Defendant first argues that the trial court erred in entering judgment against it on the count of tortious interference with a prospective economic advantage. "The standard of review in a bench trial is whether the judgment is against the manifest weight of the evidence. [Citation.] A reviewing court will not substitute its judgment for that of the trial court in a bench trial unless the judgment is against the manifest weight of the evidence. [Citation.]" *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise, Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). " 'A judgment is against the manifest weight of the evidence only when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence.'" *Chicago's Pizza*, 384 Ill. App. 3d at 859 (quoting *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001)). Additionally, as the trier of fact, the trial judge is in the best position to judge the credibility of the witnesses and to determine the weight to be given to their testimony. *Chicago's Pizza*, 384 Ill. App. 3d at 859. "When contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza*, 384 Ill. App. 3d at 859.

¶ 61    In the case at bar, the trial court found defendant liable for tortious interference with a prospective economic advantage. " '[T]o prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference.' " *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998) (quoting *Fellhauer v. City of Geneva*, 142 Ill. 2d 495, 511 (1991)); see also *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996). On appeal, defendant challenges only the third element, namely, the causation element.

¶ 62    Defendant argues that the trial court's finding that defendant's conduct caused Landstar to cease doing business with plaintiff was "based on speculative evidence" and therefore, plaintiff did not establish that defendant purposely interfered with plaintiff's expectancy and caused a termination of plaintiff's expectancy. We do not find this argument persuasive.

¶ 63    First, defendant argues that plaintiff should have called representatives of Landstar as witnesses to testify as to the reason for the loss of business. However, the only case plaintiff cites in support of this proposition is *Malatesta v. Leichter*, 186 Ill. App. 3d 602, 604-07 (1989), a case in which representatives of General Motors testified to the reasons that the plaintiff's application to purchase a dealership had been rejected. *Malatesta* does not contain any suggestion that such testimony is *required* in order to prove tortious interference with a prospective economic advantage and therefore is not instructive to defendant's argument that "[t]he only way not to have speculative evidence would have been to have testimony from Landstar as to why they ceased doing business with the Plaintiff."

¶ 64    Furthermore, "[a] party need not prove [its] case using direct evidence[.]" *Prignano v. Prignano*, 405 Ill. App. 3d 801, 818 (2010). "The trial judge, as fact finder, is entitled to draw reasonable inferences from the testimony and evidence presented at trial." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 31. "Circumstantial evidence will suffice whenever an inference may reasonably be drawn therefrom." *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 376 (2004) (citing *Grewe v. West Washington County Unit District No. 10*, 303 Ill. App. 3d 299, 303 (1999)).

¶ 65    In the case at bar, there was ample evidence in the record to support an inference that it was defendant's conduct that caused Landstar to cease doing business with plaintiff. Plaintiff's owner and employee both testified that prior to the incident, plaintiff enjoyed a longstanding relationship with Landstar; plaintiff also submitted documentation showing that it had delivered over 100 loads for Landstar in the two years prior to the incident. Defendant admitted, though both Stankiewicz and Stojkowski, that it picked up Landstar's shipment and held it, despite knowing that it was an expedited shipment that needed to be delivered immediately. Furthermore, Stankiewicz's text message to Jovanovic-Calasan told her that Stojkowski would be contacting Landstar to inform Landstar of the reason that the load was being held, and Stojkowski testified that he, in fact, spoke with Landstar's agent and informed him that defendant was holding the load because of a payment dispute with plaintiff. The load was finally delivered several days late, and Landstar refused to have any contact with plaintiff and has ceased to utilize plaintiff's services since. Thus, we cannot find that it was against the manifest weight of the evidence for the trial court to draw the inference that it was defendant's conduct that caused the loss of Landstar's business.

¶ 66    Defendant argues that "[i]t is just as plausible that Landstar ceased its business relationship with Plaintiff[] because Landstar discovered that Plaintiff was converting the money it was paid by Landstar by not paying its Lessees." However, defendant is asking us to reweigh the evidence, a task that we will not undertake on appeal. See *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006) ("A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn" from the evidence). Moreover, the fact that defendant can posit an alternate explanation does not mean that the trial court's finding that plaintiff had proven its case by a preponderance of the evidence was against the manifest weight of the evidence. "In civil actions, circumstantial evidence is not limited to instances where the circumstances support only one logical conclusion; instead, the sole limitation on the use of circumstantial evidence is that the inferences drawn therefrom be reasonable." *Eskridge v. Farmers New World Life Insurance Co.*, 250 Ill. App. 3d 603, 610 (1993). Here, all of the inferences drawn by the trial court were reasonable. Defendant argues that "[t]he evidence *** is clear that Plaintiff converted the money it was paid and failed to pay Defendant." However, that statement is not supported by the record on appeal. Defendant's counterclaim was for breach of contract, not conversion, and the trial court only found that defendant was owed $26,597.60 in unpaid invoices. There is no basis for a contention that plaintiff converted any funds. Accordingly, we cannot find that defendant's alternate theories for Landstar's cessation of business with plaintiff render the trial court's findings to be against the manifest weight of the evidence.

¶ 67    Finally, defendant argues that the information that Stojkowski conveyed to Landstar, "namely[,] that he was not being paid," was truthful and therefore, there could be no liability

23

for tortious interference with a prospective economic advantage. To prevail on a claim for tortious interference, "a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'—that the defendant has committed some impropriety in doing so." *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 485 (1998). Defendant argues that "no award for Tortious Interference can be based on truthful statements," pointing to this court's holding in *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549 (2010). However, in *Atanus*, we make no such statement. In that case, we considered whether the plaintiff was required to prove that the defendant had transmitted untruthful information in a situation where the plaintiff had included allegations in his complaint alleging that the information was untrue. *Atanus*, 403 Ill. App. 3d at 554 ("Plaintiff's main argument on appeal is that he is not required to establish that defendants transmitted untruthful information to S&C. However, that is exactly what plaintiff alleged in his complaint and thus is what he must establish in order to survive summary judgment."). We also noted that the supreme court has indicated that "giving proper and accurate reports 'cannot represent an unjustified interference.' " *Atanus*, 403 Ill. App. 3d at 555 (quoting *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288, 301 (2001)). We found that "[t]his reasoning seems to indicate that where a business entity provides accurate and proper reports to another entity in a reasonable business transaction, providing those reports should not constitute intentional interference." *Atanus*, 403 Ill. App. 3d at 556. Thus, we upheld the trial court's finding that the plaintiff was required to establish that the defendants' intentional interference consisted of providing the other entity with false information. *Atanus*, 403 Ill. App. 3d at 556.

¶ 68    The instant case bears no similarity to *Atanus*. This was not a situation in which "a business entity provides accurate and proper reports to another entity in a reasonable business transaction." *Atanus*, 403 Ill. App. 3d at 556. Instead, defendant chose to insert itself into the relationship between plaintiff and Landstar by (1) purposely causing Landstar's shipment to be delayed and (2) contacting Landstar directly and informing it that the shipment was delayed due to a "dispute of payment" between plaintiff and defendant. Defendant did so while knowing that a delay in shipment would cause problems for plaintiff, as well as plaintiff's customers, and while knowing that the delay in shipment could jeopardize a relationship with Landstar. Furthermore, we note that Jovanovic-Calasan testified that until defendant held the loads, she was unaware that there was an issue with defendant's payments because she testified that she sent two checks to defendant's bill factoring company and was unaware that the company had not received them. Thus, it is not even clear that Stojkowski's statement that there was a "dispute of payment" was true at the time. Consequently, the trial court's finding that there was an "intentional and unjustified interference by the defendant that induced or caused" the termination of plaintiff's business with Landstar (*Anderson*, 172 Ill. 2d at 406-07) was not against the manifest weight of the evidence and we affirm the judgment in favor of plaintiff.

¶ 69                                II. Punitive Damages

¶ 70    Defendant, in a one-sentence argument, also contends that the trial court erred in awarding plaintiff punitive damages, claiming that if we reverse the judgment as to tortious interference, we must also reverse the award of punitive damages. However, as noted, we affirm the trial court's judgment as to the tortious interference count, and defendant makes no argument that imposition of punitive damages was improper based on the finding of tortious

interference. Punitive damages may be awarded in a tortious interference action "where the plaintiff has specifically alleged actual malice, defined as a positive desire and intention to injure." (Internal quotation marks and citations omitted.) *Reuben H. Donnelley Corp. v. Brauer*, 275 Ill. App. 3d 300, 313 (1995). "Whether to award punitive damages is an issue that we leave to the sound discretion of the trial court, which decision will not be disturbed absent an abuse of discretion." *Dowd & Dowd*, 352 Ill. App. 3d at 388 (citing *Levy v. Markal Sales Corp.*, 268 Ill. App. 3d 355, 379 (1994)). Here, as noted, defendant makes no argument that the trial court abused its discretion in awarding punitive damages on the tortious interference count, and we find no such abuse of discretion.

¶ 71                                                      CONCLUSION

¶ 72        For the reasons set forth above, the trial court's finding that defendant was liable for tortious interference with a prospective economic advantage was not against the manifest weight of the evidence and its award of punitive damages was not an abuse of discretion.

¶ 73        Affirmed.