St. Eve, Circuit Judge.
There have been several constitutional challenges to school busing in Wisconsin over the years. See, e.g. , St. Augustine Sch. v. Evers , 906 F.3d 591 (7th Cir. 2018) ; Racine Charter One, Inc. v. Racine Unified Sch. Dist. , 424 F.3d 677 (7th Cir. 2005). This is another. Our focus here is on the Milwaukee Public School District ("MPS"), private schools, and the Equal Protection Clause.
*1006 MPS offers free transportation to public-school students who attend certain schools outside of their neighborhoods. All other students-including private-school students-are only eligible if they live farther than one mile from the nearest public-transportation stop. MPS also requires private schools to submit a roster of students who need transportation by July 1; it has no such requirement for its public schools. St. Joan Antida High School, a private school, filed this lawsuit, claiming that these restrictions violate the Equal Protection Clause. This is especially so, St. Joan submits, because state law requires MPS to transport students with "reasonable uniformity," whether they attend public or private schools.
The district court granted summary judgment to MPS, and St. Joan appeals. We affirm in part and reverse and remand in part. Rational bases exist for the differences in busing eligibility, and so we affirm on that ground. But more work needs to be done to resolve St. Joan's challenge to the July 1 deadline, and so we reverse and remand on that ground.
I. Background
Busing parochial schoolchildren with public funding used to be considered unconstitutional in Wisconsin. See State ex rel. Reynolds v. Nusbaum , 17 Wis.2d 148, 115 N.W.2d 761, 770 (1962). In 1967, however, the state held a referendum, which asked voters whether Wisconsin's constitution should be amended to permit state-funded transportation of private and parochial students. The voters decided it should, and the Wisconsin constitution was amended. Wis. Const. art. I, § 23 ; see also Cartwright v. Sharpe , 40 Wis.2d 494, 162 N.W.2d 5, 8 (1968).
After the amendment, Wisconsin passed enabling legislation that requires school districts to provide transportation for both public- and private-school students. See Wis. Stat. § 121.54. There are exceptions, though. The most notable (for our purposes) is the exception for a school district operating within a metropolitan area. Under § 121.54 's "city option," a school district in a city need not-but can decide to-provide transportation if other public transportation is generally available to schoolchildren. Id. § 121.54(1). Should a school district exercise the city option, there must "be reasonable uniformity in the transportation furnished to pupils, whether they attend public or private schools." Id. § 121.54(1)(b) (emphasis added).
MPS has exercised the city option, and it therefore offers transportation to Milwaukee-area schools. There are two primary types of public schools in the MPS system: (1) citywide schools, which offer special courses, like language-immersion classes or International Baccalaureate® programs, and draw from the entire Milwaukee area; and (2) attendance-area schools, which generally do not have such programs and draw only from a particular neighborhood. MPS, at times, designates certain students to attendance-area schools outside of their neighborhoods-making the school a "nonattendance-area school" (as we will call it, for ease of reference). The Milwaukee area, of course, also has private schools, like St. Joan. MPS explains that, under state rules, St. Joan technically has an attendance area; but unlike public attendance-area schools, St. Joan's allotted area is the entire city of Milwaukee.
To ensure transportation to these schools, MPS devised Policy 4.04. This lawsuit challenges two parts of that policy.
The first challenge concerns how MPS decides which students are eligible for busing. Under § 2 of Policy 4.04, high schoolers may receive free transportation only if they live two or more miles from their *1007 school and "more than one mile walking distance from public transportation" (a restriction we will call the "one-mile rule").[1] But § 5 provides more generous transportation benefits for high schoolers who attend either citywide or nonattendance-area schools. That section, which is titled "Racial Balance, Modernization, Overload, and Lack of Facility," makes any student assigned to a school farther than two miles from her home eligible for free transportation-regardless of the student's proximity to public transportation. In fewer words, citywide and nonattendance-area students are not subject to the one-mile rule under § 5.
The second challenge is to MPS's roster-notification deadline. Under § 121.54(2)(b), private schools must submit the names, grade levels, and residences of all students who are eligible to receive busing to MPS by May 15. The provision allows a school board to "extend the notification deadline," which MPS has done. Policy 4.04 states that private schools must submit the roster by the third Friday in September. In practice, however, the parties agree that MPS requires the rosters by July 1. According to MPS, the deadline is necessary so that it has sufficient time to arrange for the transportation of eligible private-school students before school starts. There is no like roster-notification deadline for public schools, MPS says, because it has immediate access to the requisite information needed for eligible public-school students.
In 2016, St. Joan applied to MPS for student transportation during the upcoming 2016-2017 school year. On May 14, 2016, St. Joan submitted its original roster, which included the names of sixty-two students relevant to this appeal; on September 29, 2016, it updated the list with six more relevant names. What prompted St. Joan to update its roster is unclear, but MPS refused to bus any of these sixty-eight students. Each of them lived within one mile of public transportation, and the six later-added students were disclosed after the July 1 deadline. St. Joan protested, but eventually covered transportation for the students. Doing so cost a total of $178,640 for the 2016-2017 and 2017-2018 school years.
Looking to recover that loss, St. Joan brought this action, which also seeks injunctive and declaratory relief. St. Joan asserts two claims. The first claim alleges that Policy 4.04's two restrictions-the one-mile rule and the July 1 deadline-violate the Equal Protection Clause of the Fourteenth Amendment. See 42 U.S.C. § 1983. The second claim, brought under Wis. Stat. § 121.54, asserts that the restrictions violate Wisconsin's reasonable uniformity requirement.[2] After discovery, the parties cross-moved for summary judgment. The district court granted MPS's motion and denied St. Joan's, reasoning that Policy 4.04's two restrictions had rational bases. 293 F.Supp.3d 813 (E.D. Wis. 2018). With the constitutional claim dismissed, the district court declined *1008 to exercise supplemental jurisdiction over St. Joan's state-law claim. 28 U.S.C. § 1367(c)(3). St. Joan appeals.
II. Discussion
The Equal Protection Clause of the Fourteenth Amendment guarantees that "no State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr. , 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although the Equal Protection Clause does not endow a private right of action, 42 U.S.C. § 1983 does for any constitutional deprivation under color of state law. A municipal entity acting under color of state law-like MPS-may be held liable under § 1983 where it is responsible for the constitutional deprivation. Monell v. Dep't of Soc. Servs. of City of New York , 436 U.S. 658, 694-695, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
On appeal, St. Joan contends that the one-mile rule and the July 1 deadline violate the Equal Protection Clause. We first determine how searching our inquiry must be-under either strict-scrutiny or rational-basis review-before determining whether the restrictions pass constitutional muster. Because this case comes to us after summary judgment, our review is de novo. Dunn v. Menard, Inc. , 880 F.3d 899, 905 (7th Cir. 2018). We can affirm on any ground supported by the record. Terry v. Gary Cmty. Sch. Corp. , 910 F.3d 1000, 1004 (7th Cir. 2018).
A. Standard of Scrutiny
An equal-protection claim merits strict scrutiny, our most exacting inquiry, only if the state-crafted classification disadvantages a suspect class or "impermissibly interferes" with a fundamental right. Segovia v. United States , 880 F.3d 384, 390 (7th Cir. 2018). Otherwise rational-basis review governs.[3] See Armour v. City of Indianapolis, Ind. , 566 U.S. 673, 680, 132 S.Ct. 2073, 182 L.Ed.2d 998 (2012) ; Hooper v. Bernalillo Cty. Assessor , 472 U.S. 612, 618, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). This case does not involve a suspect class, like race, and neither education nor free transportation to school is a fundamental right. Kadrmas v. Dickinson Pub. Sch. , 487 U.S. 450, 457-62, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) ; Plyler v. Doe , 457 U.S. 202, 223, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) ; San Antonio Indep. Sch. Dist. v. Rodriguez , 411 U.S. 1, 33-35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ; Racine Charter One, Inc. v. Racine Unified Sch. Dist. , 424 F.3d 677, 690 n.4 (7th Cir. 2005).
St. Joan, however, invokes another fundamental right-the right of parents to direct the education of their children. That right does exist. In Pierce v. Soc'y of the Sisters , the Supreme Court struck down a ban on parochial education and held that the "fundamental theory of liberty" protects parents from state attempts to "forc[e]" students into public schooling. 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ; see also Troxel v. Granville , 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). But the existence of that fundamental right, and its potential implication here, is not enough to trigger strict scrutiny. See, e.g. , Harlan v. Scholz , 866 F.3d 754, 760 (7th Cir. 2017). A direct and substantial interference is required. See Lyng v. Castillo , 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986) ;
*1009 Bowen v. Gilliard , 483 U.S. 587, 602-03, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987) ; Zablocki v. Redhail , 434 U.S. 374, 386-87 & n.12, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ; see also Griffin High Sch. v. Illinois High Sch. Ass'n , 822 F.2d 671 (7th Cir. 1987). St. Joan has shown no such interference with the right recognized in Pierce .
St. Joan claims that the withholding of free busing, a state-subsidized benefit, amounts to a prohibited interference with the right to direct a child's education. This stretches Pierce too far. As a general rule, a state's "decision not to subsidize the exercise of a fundamental right does not infringe the right" and is therefore "not subject to strict scrutiny." Regan v. Taxation with Representation of Washington , 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ; see also, e.g. , Sweeney v. Pence , 767 F.3d 654, 669 (7th Cir. 2014). More to the point, a state that chooses not to assist a private school does not breach the right Pierce described. In Norwood v. Harrison , the Supreme Court explained:
It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid.
413 U.S. 455, 462, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). In Maher v. Roe , the Court added that Pierce "casts no shadow over a State's power to favor public education by funding it." 432 U.S. 464, 477, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) ; see also Cornerstone Christian Sch. v. Univ. Interscholastic League , 563 F.3d 127, 138 n.12 (5th Cir. 2009) ; Gary S. v. Manchester Sch. Dist. , 374 F.3d 15, 19-22 (1st Cir. 2004) ; Cass R. Sunstein, Is There an Unconstitutional Conditions Doctrine? , 26 San Diego L. Rev. 337, 340-42 (1989). Pierce , then, does not protect against a state favoring public schools with public dollars, which is-at worst-all MPS has done.
St. Joan's reach for strict scrutiny stretches the record, too. There is no evidence that Policy 4.04 hamstrings the right of parents to direct their children's education. Parents can and do choose to send their children to Milwaukee private schools, despite Policy 4.04. Parents who cannot rely upon private transportation have other options available. All sixty-eight children live within one mile of public transportation (hence this lawsuit), and St. Joan in fact provided the students with busing. To be sure, the record contains testimonial evidence that some unenumerated number of families declined to send their children to St. Joan because it could not promise free busing. But that Policy 4.04 caused some families to "decide to modify" where they sent their children "does not transform" the policy into an intrusion on parental rights. Bowen , 483 U.S. at 601-02 & n.16, 107 S.Ct. 3008 ; accord Califano v. Jobst , 434 U.S. 47, 54, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977). The burden must be direct and substantial, and no evidence shows that.
St. Joan also makes much of the fact that Wisconsin considers free transportation for private-school students to be "important," as evidenced by the 1967 constitutional amendment and § 121.54. This emphasis is misplaced. State-specific policies do not augment fundamental rights. Accord Washington v. Glucksberg , 521 U.S. 702, 720-21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (only rights that are "deeply rooted in this Nation's history and tradition" count as fundamental) (citation omitted). Wisconsin law has implications on whether there are rational bases for Policy 4.04's restrictions (as we discuss below), but not whether strict scrutiny applies.
*1010 With strict scrutiny off the table, rational-basis review governs St. Joan's challenges to the one-mile rule and the July 1 deadline. That standard permits a court to invalidate a legislative classification only if there is no rational relationship between the classification and "some legitimate government purpose." Segovia , 880 F.3d at 390. "Some" is key-a classification is generally valid as long as a rational basis is plausible, even if the legislature did not expressly endorse it. See FCC v. Beach Commc'ns, Inc. , 508 U.S. 307, 313-15, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ; Indiana Petroleum Marketers & Convenience Store Ass'n v. Cook , 808 F.3d 318, 322 (7th Cir. 2015). Rational-basis review tolerates overinclusive classifications, underinclusive ones, and other imperfect means-ends fits. Heller v. Doe , 509 U.S. 312, 319-320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) ; Gregory v. Ashcroft , 501 U.S. 452, 473, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ; Vance v. Bradley , 440 U.S. 93, 107-09, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). The standard also imputes "a strong presumption of validity" on the contested classification. Beach Commc'ns , 508 U.S. at 314-15, 113 S.Ct. 2096. To over-come that presumption, a challenger must negate "every conceivable basis which might support" the classification. Id.
B. The One-Mile Rule
Policy 4.04 draws a line. On one side are private schools, like St. Joan, and attendance-area schools, both of which are subject to the one-mile rule; on the other side are citywide and nonattendance-area schools, which are not. St. Joan argues that this line-drawing violates equal protection, at least as applied to it, because the one-mile rule irrationally treats private schools differently.
Equal-protection claims start with the question: treated differently than whom? See Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 9.1, 698 (5th ed. 2015). In cases like this, where the challenged regulation provides explicit classifications, the answer should be easy. Driving laws may treat fifteen-year-olds differently than sixteen-year-olds. Liquor laws may treat saloons differently than grocery stores. And so on. The parties, however, muddle the answer here. MPS submits that St. Joan is technically an attendance-area school, because it has an allotted attendance area under state regulations. Thus, MPS contends, St. Joan is treated differently only when compared to dissimilar schools; but it is treated the same as its relevant comparator-attendance-area schools. St. Joan vehemently disagrees, arguing that it must be compared to citywide schools. St. Joan has an attendance area, the school concedes, but that attendance area is the entire city-just like citywide schools.
The debate is unnecessary. Arguments over whether there is an apt "similarly situated" comparator are suited for class-of-one equal-protection cases, in which the individual claimant must show that she was treated differently (and irrationally so) than someone else. See, e.g. , Harvey v. Town of Merrillville , 649 F.3d 526, 532 (7th Cir. 2011). But where, as here, "the classification appears in the text of" the challenged regulation, we do not "need to identify a comparator." Monarch Beverage Co. v. Cook , 861 F.3d 678, 682 (7th Cir. 2017). The regulation that imposes the burden does the work for us.
Here, Policy 4.04 treats private schools, like St. Joan, differently than citywide schools and nonattendance-area schools-and that requires a rational basis. St. Joan submits that there is no rationale for the different treatment, especially in light of § 121.54 's reasonable uniformity requirement. MPS responds with two rational bases: (1) furthering its educational mandate by reducing overcapacity and expanding *1011 access to special programs; and (2) cost savings. We will address whether those justifications suffice on their own terms, then consider the impact of § 121.54.
MPS, a public-school district, has obvious legitimate interests in reducing overcapacity in crowded attendance-area schools and in expanding special program access to its students. See Lewis v. Ascension Par. Sch. Bd. , 806 F.3d 344, 363 (5th Cir. 2015) ; Spurlock v. Fox , 716 F.3d 383, 403 (6th Cir. 2013) ; Doe ex rel. Doe v. Lower Merion Sch. Dist. , 665 F.3d 524, 557 (3d Cir. 2011). Either goal requires the same feat-to put more kids in citywide and nonattendance-area classrooms. To that end, exempting students who attend those schools from the one-mile rule means more kids will get busing to those schools, which in turn encourages and makes easier their attendance to those schools. That is rational.
There is a related reason for limiting the one-mile rule's application. MPS students who attend citywide or nonattendance-area schools are, logically, more likely to have to travel farther from their home to get to school than students who go to attendance-area schools. That beckons a trade-off. In exchange for MPS students traveling farther, MPS makes the travel easier by ensuring free busing for most students.
Faced with these rational bases, St. Joan reframes the issue. It posits, and the district court concluded, that the question is not whether MPS had a rational basis for exempting citywide and nonattendance-area students from the one-mile rule (the district court accepted that it did). The question, St. Joan says, is whether there is a rational basis for not extending the same benefit to private-school students. St. Joan sees an upside to the latter formulation, believing it requires MPS to identify something undeserving about private-school students to justify denying them the busing benefits some public-school students receive. But that is not how rational-basis review works.
The standard, like most in constitutional law, is a means-end test. See G. Stone et al., CONSTITUTIONAL LAW 453 (7th ed. 2013). We need only identify a legitimate end and ask whether the means-the classification-bears a rational relationship to the end. E.g. , Armour , 566 U.S. at 680, 132 S.Ct. 2073 ; Beach Commc'ns , 508 U.S. at 315-20, 113 S.Ct. 2096. So if, for example, a state is concerned with the success of its small-business sector, and, in response, it passes a regulation offering more generous grant terms to companies with fewer than fifty employees, the regulation is rationally related to the state's legitimate concern. The analysis ends there. See U.S. R.R. Ret. Bd. v. Fritz , 449 U.S. 166, 176-79, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). On rational-basis review, we do not additionally require the state to persuade us why a company with, say, two-hundred employees would not also benefit from more grant money. Cf. Rothe Dev., Inc. v. U.S. Dep't of Def. , 836 F.3d 57, 73 (D.C. Cir. 2016) (deeming rational a grant program for socially disadvantaged businesses). Lawmakers often have to draw lines when "classifying governmental beneficiaries," and sometimes that means those with "strong claim[s] to favored treatment" will be left out. Beach Commc'ns , 508 U.S. at 315-16, 113 S.Ct. 2096 ; see also, e.g. , Fitzgerald v. Racing Ass'n of Cent. Iowa , 539 U.S. 103, 108, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) ; Regan , 461 U.S. at 550-51, 103 S.Ct. 1997 ; Maher , 432 U.S. at 477, 97 S.Ct. 2376 ; City of New Orleans v. Dukes , 427 U.S. 297, 303-06, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam); Dandridge v. Williams , 397 U.S. 471, 486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (per curiam).
That is what happened here. MPS has legitimate interests in reducing overcrowding and expanding educational access in *1012 MPS schools. With those goals in mind, MPS eased transportation to and from the schools that can help it do both. Easing transportation for private-school (and attendance-area) students, on the other hand, would do little to further MPS's goals. And that distinction gives MPS reason enough to treat the schools differently under rational-basis review. See, e.g. , Idaho Dep't of Employment v. Smith , 434 U.S. 100, 101, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977) (per curiam).
St. Joan attacks the rationality of MPS's application of the one-mile rule on other grounds. It asserts that overcrowding is not truly a problem in MPS schools, because many attendance-area schools are not at maximum capacity. St. Joan argues further that MPS has no reason to differentiate St. Joan from citywide schools because St. Joan also offers special programming. These arguments may have held water if St. Joan had a strict-scrutiny case. But it does not. On rational-basis review, classifications can be both underinclusive and overinclusive and still survive. E.g. , Wisconsin Educ. Ass'n Council v. Walker , 705 F.3d 640, 655-56 (7th Cir. 2013). MPS, moreover, does not need conclusive support from "evidence or empirical data" to make the rational decisions it has. Beach Commc'ns , 508 U.S. at 313-15, 113 S.Ct. 2096.
Turning to MPS's second justification, cost savings may serve as a rational basis for classifications. See Bankers Life & Cas. Co. v. Crenshaw , 486 U.S. 71, 83-84, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988) ; Bowen , 483 U.S. at 599, 107 S.Ct. 3008 ; Srail v. Vill. of Lisle, Ill. , 588 F.3d 940, 948 (7th Cir. 2009) ; Irizarry v. Bd. of Educ. of City of Chicago , 251 F.3d 604, 610 (7th Cir. 2001). The cases that so hold generally identify potential costs that are unique or distinct to the disfavored group. See Bankers Life , 486 U.S. at 83-84, 108 S.Ct. 1645 (charging assessments on non-monetary judgments "would impose a considerable cost in judicial resources"); Irizarry , 251 F.3d at 610 (excluding unmarried persons from dependent benefits resulted in "distinct" savings). In another busing case, for example, we concluded that a school district had a rational basis for not transporting a charter school's students, because doing so would have resulted in "unique and additional costs" to the school district. Racine Charter One , 424 F.3d at 685-87. That is not to say that states can randomly discriminate to keep costs down. If the state's cutoff is arbitrary or invidious, then the classification is by definition not rational. See Mem'l Hosp. v. Maricopa Cty. , 415 U.S. 250, 263, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) ; Shapiro v. Thompson , 394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), overruled on other grounds by Edelman v. Jordan , 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).
Cost savings, in the context of MPS's other goals, provide an additional rational basis here. It may well be true, as St. Joan asserts, that a St. Joan student is no more expensive to bus than a citywide or nonattendance-area student. But MPS is already stretched thin; it spent forty-million dollars to provide busing in the 2016-2017 school year, barely any of which state aid covered. Despite those straits, MPS could believe that overcrowding and access concerns were worth taking on the added cost of busing most citywide and nonattendance-area students. It has no similar reason to take on those costs for private and attendance-area students. So MPS made the rational choice: pay more to expand busing to schools that could reduce overcrowding and promote program access, but not to schools that are less likely provide the same returns. See Bowen , 483 U.S. at 596, 107 S.Ct. 3008 ; Idaho Dep't of Employment , 434 U.S. at 101, 98 S.Ct. 327.
*1013 The one-mile rule therefore has rational bases. But how does § 121.54 's reasonable uniformity requirement factor in? Courts typically ask whether a rational basis is conceivable, without paying mind to what the state actually said or thought. Monarch Beverage , 861 F.3d at 685. St. Joan, however, argues that this case is different, because § 121.54 precludes MPS from relying on the rational bases that it has.
St. Joan's argument derives from Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty., W. Va. , 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). In Allegheny , the Supreme Court considered a county's property-tax assessment scheme that "systematically produced dramatic differences in valuation"-in some cases assessing property at more than thirty times the rate of comparable properties. Allegheny , 488 U.S. at 341, 109 S.Ct. 633. The county defended the scheme by arguing that it aimed to peg "properties at true current value." But that goal, the Court held, could not rationally explain the gross disparities in tax treatment. Id. at 343-44, 109 S.Ct. 633. Nor could state law. The Court recognized that states can make rational distinctions among taxpayers and assess different tax burdens, but the state had "not drawn such a distinction." Id. at 345, 109 S.Ct. 633. To the contrary, West Virginia's constitution mandated that "taxation shall be equal and uniform throughout the State." Id. at 338, 109 S.Ct. 633 (emphasis added). The Court therefore saw no conceivable rational bases for the scheme. Id. at 345-46, 109 S.Ct. 633.
Allegheny 's holding is quite narrow. Three years after Allegheny came Nordlinger v. Hahn , another equal-protection challenge involving property taxes. 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). Like the scheme in Allegheny , the law in Nordlinger "resulted in dramatic disparities in taxation." Id. at 14, 112 S.Ct. 2326. But Allegheny was distinguishable, according to the Court. Citing the Allegheny county's irrational justification and the state-law uniformity directive, the Court concluded that Allegheny "was the rare case where the facts precluded any plausible inference" of a rational basis. Id. at 14-16, 112 S.Ct. 2326 ; see also Fitzgerald , 539 U.S. at 109-10, 123 S.Ct. 2156 ; Chemerinsky, CONSTITUTIONAL LAW 718 (after Nordlinger , Allegheny "seems limited to challenges of arbitrary and unjustifiable administrative decisions"). Two decades after Nordlinger , the Court again emphasized Allegheny 's limits in Armour .
In Armour , the Supreme Court evaluated how Indianapolis divvied up the costs of a new sewer project among local homeowners. Indiana law required that such costs be "apportioned equally." Ind. Code § 36-9-39-15(b)(3) (2011). Indianapolis did so, at least at first, by assessing each homeowner the same rate. After the assessment, some paid in lump sums and others began paying in installments. The city soon reversed course, though, and opted to use bonds to pay for the project. It then forgave any outstanding installments owed, but it refused to pay back homeowners who had paid in a lump sum. Armour , 566 U.S. at 678-79, 132 S.Ct. 2073. The result: homeowners who paid upfront spent as much as thirty times more than other homeowners. See id. at 679, 132 S.Ct. 2073.
Despite the parallels-a state uniformity law and gross disparity-the Court in Armour held that Allegheny did not control. Id. at 687, 132 S.Ct. 2073. Allegheny , the Court explained, "involved a clear state law requirement clearly and dramatically violated." Id. (emphases added). Not so in Armour , according to the Court, because the city followed state law in the first instance, and state law said nothing about forgiveness plans. The Court went no further on the state-law question, rejecting *1014 the view that "ordinary violations of ordinary state tax law" can amount to "violations of the Federal Constitution." Id. at 687-88, 132 S.Ct. 2073. The Court repeated that Allegheny was the " 'the rare case where the facts precluded' any alternative reading of state law and thus any alternative rational basis." Id. at 687, 132 S.Ct. 2073 (quoting Nordlinger , 505 U.S. at 16, 112 S.Ct. 2326 ).
This is not one of those rare cases. MPS's avowed rational bases are sound, and § 121.54 does not render them implausible. For one, § 121.54 's reasonable uniformity requirement is not "clear." See Armour , 566 U.S. at 687, 132 S.Ct. 2073. It is the opposite-"ambiguous"-as St. John Vianney Sch. v. Bd. of Educ. of Sch. Dist. of Janesville held. 114 Wis.2d 140, 336 N.W.2d 387, 393 (App. 1983). There is also little caselaw explaining the requirement. St. John Vianney , for its part, noted that the requirement prevents discrimination based on how far students live from school. Id. , 114 Wis.2d 140, 336 N.W.2d at 393-94 ; see also Wis. Stat. § 121.54(2)(c), (4) (discussing reasonable uniformity in terms of the distances transported to and from school). That, however, does not move much here, because the one-mile rule does not discriminate on a distance-from-school basis. What is more, absent "clear" law, we do not see what MPS "clearly and dramatically" violated. See Armour , 566 U.S. at 687, 132 S.Ct. 2073. It is true that the one-mile rule effectively denies busing to most of the St. Joan students who applied for it. But we decline to speak for the Wisconsin courts as to whether that result is "reasonable" as a matter of local busing policy. MPS is financially strained as it is, and the rule does apply uniformly to private and attendance-area students.[4]
Of course, none of this means that the one-mile rule complies with § 121.54. That question is not before us, and the answer, unsettled as it is, should come from the Wisconsin courts. To resolve the equal-protection claim before us, we hold only that MPS has offered rational bases that are plausible notwithstanding state law.
In coming out the other way, the dissent goes further than we are willing. It draws on legislative history and potentially comparable lower-court decisions (like St. John Vianney ) to conclude that the one-mile rule violates § 121.54 clearly enough to implicate Allegheny and negate MPS's rational bases. With respect, we think that approach does more than what Allegheny and Armour did. For even if the one-mile rule violates § 121.54,[5] a mere violation of state law does not boot-strap itself into a violation of the Equal Protection Clause. Armour , 566 U.S. at 687-88, 132 S.Ct. 2073 ; see also William C. Cohen, State Law in Equality Clothing: A Comment on Allegheny Pittsburgh Coal Company v. County Commission , 38 UCLA L. Rev. 87, 99-103 (1990).
*1015 C. The July 1 Deadline
MPS additionally requires private schools to provide by July 1 the names of students who need busing. This deadline applies only to private-school students, not MPS students, and thus St. Joan claims that it also violates equal protection. In response, MPS proffers one rational basis in support of the deadline: administrative necessity.
There is no question that administrative concerns can justify certain classifications. E.g. , Armour , 566 U.S. at 683, 132 S.Ct. 2073 ; Bankers Life , 486 U.S. at 84, 108 S.Ct. 1645 ; Hearne v. Bd. of Educ. of City of Chicago , 185 F.3d 770, 775 (7th Cir. 1999). Such concerns exist here. Before school starts, MPS must determine which students are eligible for transportation, compare school rosters to confirm that students are not double booked, and arrange for bus services or contract for alternative transportation services. See Wis. Stat. § 121.55. These tasks all require MPS to have the students' information well in advance of the school year. While MPS has direct access to its own students' information, it does not have the same for private-school students. As a result, some deadline by which private schools must provide student information is logistically rational-and statutorily mandated by Wis. Stat. § 121.54(2)(b). Whether July 1, as opposed to, say, September 1, is the wisest or fairest choice is not for us to decide. See, e.g. , Heller , 509 U.S. at 319-320, 113 S.Ct. 2637 ; Nordlinger , 505 U.S. at 18, 112 S.Ct. 2326 ; Hodel v. Indiana , 452 U.S. 314, 331, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981).
That is sufficient to deem the deadline constitutional on its face.[6] See Midwest Fence Corp. v. U.S. Dep't of Transp. , 840 F.3d 932, 941-46 (7th Cir. 2016) ; see also United States v. Salerno , 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). St. Joan, however, also lobs a related challenge to what comes after the deadline. According to St. Joan, MPS treats students who enroll near or after July 1 differently depending on their school. To illustrate, St. Joan offers a hypothetical. Suppose MPS completes transportation arrangements for all schools (public and private) by August 15. A week later, two families, each with a fourteen-year-old, move to Milwaukee. One family decides to send its child to a private school outside of her neighborhood; the other opts for a public school outside of her neighborhood. And then MPS learns of the two students, and their need for busing, on the exact same day. The private-school student cannot get busing; yet the public-school student could, according to St. Joan.
That prospect gives us pause. The time needed to arrange for transportation before the school year justifies imposing a roster-notification deadline on private schools. But pre -arrangement needs offer no justification for treating post -arrangement latecomers differently. Granted, some rigidity in the deadline may be rational (to motivate private schools to comply with the it); but even that would not justify treating students who move to the district near or after the deadline differently, based only on whether they go to private or public school. We see no rational basis for that distinction, and MPS has not provided any. Perhaps there are heightened burdens associated with latecomer private-school students that do not exist for public-school students, but again, MPS has not pointed to any.
*1016 That said, we cannot order relief on this record. Unlike the dissent, at least two things remain unclear to us. First, we do not know whether, in fact, MPS enforces the July 1 deadline in the manner just described. At oral argument, counsel for MPS hedged when asked directly; and the parties have not directed us to a part of the record that reveals a clear answer. Second, we do not know why St. Joan updated its roster after the July 1 deadline-whether the result of latecomers, procrastination, or something else. These facts matter, of course, because an as-applied challenge concerns only the present case, not hypotheticals. See, e.g. , Hegwood v. City of Eau Claire , 676 F.3d 600, 603 (7th Cir. 2012) ; United States v. Skoien , 614 F.3d 638, 645 (7th Cir. 2010) (en banc). We therefore conclude that further fact-finding is necessary. See, e.g. , Shimer v. Washington , 100 F.3d 506, 510 (7th Cir. 1996). After that occurs, it is up to the district court in the first instance to decide what relief, if any, is appropriate.
III. Conclusion
For these reasons, we AFFIRM the district court's judgment with respect to the one-mile rule and we REVERSE and REMAND for further proceedings consistent with this opinion with respect to the July 1 deadline.

Policy 4.04 provides different transportation terms for elementary schools. Those terms are not relevant to this dispute.

St. Joan sued on its own behalf and on behalf of the sixty-eight children's parents, from whom St. Joan received assignments of rights and claims. The exemplar assignment in the record speaks only of a "full and complete assignment of rights and claims under Wis. Stat. §§ 121.54 and 121.55"-it does not address assignment of § 1983 claims. The parties do not address this issue. It does not deter us, though, because the law generally holds that schools have standing to assert the constitutional rights of parents to direct their children's education. See Runyon v. McCrary , 427 U.S. 160, 175 n.13, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) ; Pierce v. Soc'y of the Sisters , 268 U.S. 510, 535-36, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) ; Ohio Ass'n of Indep. Sch. v. Goff , 92 F.3d 419, 422 (6th Cir. 1996).

We set aside intermediate scrutiny, which generally applies to classifications based on quasi-suspect classes, like gender, because it has no potential application to this case. See, e.g. , Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp. , 743 F.3d 569, 577 (7th Cir. 2014).

We said earlier that we do not need to determine, for equal-protection purposes, what types of schools St. Joan is most like (citywide or nonattendance area, who generally get busing, or attendance-area schools, who generally do not). At the same time, we have no basis to say what practical and regulatory distinctions will matter to the Wisconsin courts for § 121.54 purposes.

It is worth adding that in Allegheny , unlike here, the state courts at least had an opportunity to decide whether the challenged scheme violated state law. West Virginia's highest court assumed that it did, but the court refused to order relief because it concluded that absent "intentional and systemic" undervaluation the petitioners had to seek relief from the assessor. Allegheny , 488 U.S. at 342-43, 109 S.Ct. 633 (citing In re 1975 Tax Assessments Against Oneida Coal Co. , 178 W.Va. 485, 360 S.E.2d 560, 565 (1987) ); see also John Hart Ely, Another Spin on Allegheny Pittsburgh , 38 UCLA L. Rev. 107, 109 (1990) (explaining the "strange" circumstances of Allegheny ).

We use the term "on its face" advisedly, although we note that the July 1 deadline has not been recorded anywhere (at least as far as this record is concerned). That is odd, particularly because the July 1 deadline conflicts with the September deadline set forth in Policy 4.04 and the May 15 deadline in Wis. Stat. § 121.54(2)(b). St. Joan, however, has not argued that these facts impact the constitutional analysis, and so we do not address them.