In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 17-2040

JOHN DOE,

*Plaintiff-Appellant,*

*v.*

KEVIN K. MCALEENAN,
Acting Secretary of Homeland
Security, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-01387 — **John Z. Lee**, *Judge*.

---

ARGUED MARCH 28, 2019 — DECIDED JULY 3, 2019

---

Before RIPPLE, MANION, and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. John Doe, a native and citizen of
Iran, obtained an immigrant visa through an employment-
based visa program for investors, and, in due course, he suc-
cessfully applied to adjust his status to that of a conditional
permanent resident. At the conclusion of his two-year, condi-
tional term, Mr. Doe petitioned to remove the conditions on

his residency. The United States Citizenship and Immigration Services ("USCIS") denied his petition. Mr. Doe challenged the denial in the district court, claiming that the decision was arbitrary and capricious, exceeded the relevant statutory and regulatory authority, and deprived him of his due process rights under the Fifth Amendment. The district court granted summary judgment to the defendants. For the reasons below, we affirm the judgment of the district court.[1]

## I.

## BACKGROUND

### A.

Because the factual and procedural background of this case involves a visa system which is not frequently the subject of our cases, we begin by setting forth the statutory and regulatory framework.

The EB-5[2] program, colloquially known as the "investor visa," is a program designed by Congress to encourage significant, job-creating investment in commercial enterprises in the United States, with special incentives related to rural or economically depressed communities where unemployment is at least 150% of the national average. The program,

---

[1] The district court had jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 701 *et seq.* Our jurisdiction is based on 28 U.S.C. § 1291.

[2] The designation "EB-5" denotes that it is the fifth preference category of "employment-based" visas.

in its current iteration,[3] requires an alien investor to make an investment of at least $500,000 for a new commercial enterprise located in a rural or high-unemployment area and up to $3,000,000 for a new commercial enterprise located in an area with an unemployment rate significantly *below* the national average.[4] The enterprise can be the creation of a new business, a purchase of an existing business with substantial restructuring or reorganization, or the substantial expansion of an existing business. The enterprise must create full-time employment for a minimum of ten qualified employees. *See generally* 8 U.S.C. § 1153(b)(5); 8 C.F.R. § 204.6.

The process by which an alien obtains status under § 1153(b)(5) begins with a petition for classification as an alien entrepreneur. A petition must be accompanied by evidence "that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees." 8 C.F.R. § 204.6(j). Specifically, the petition must contain evidence of the existence or formation of the enterprise itself. To demonstrate "that the petitioner has invested or is

---

[3] Substantial changes have been proposed to the program, including increases in the minimum investment and a redefinition of targeted areas. *See EB-5 Immigrant Investor Program Modernization*, 82 Fed. Reg. 4738 (proposed Jan. 13, 2017) (to be codified at 8 C.F.R. pts. 204 and 216).

[4] The alien need not "create" a "new" business in the literal sense. "New" for purposes of the statute means established after November 29, 1990, the date of enactment of the Immigration Act of 1990, Pub. L. no. 101-649, 104 Stat. 4978. *See* 8 C.F.R. § 204.6(e). Any business formed after the statute's effective date is "new" for the purposes of the statute, and an alien need only "invest" in, not create, such business.

actively in the process of investing the required amount of capital, the petition must be accompanied by evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk." *Id.* § 204.6(j)(2). Financial documents showing deposits and expenditures must be submitted.

Immigrant investors seeking to qualify for an EB-5 visa may make either direct investments into a business or can invest through a business designated by USCIS as a "regional center." Regional centers are essentially clearinghouses for eligible investment opportunities. As the USCIS Policy Manual states, "The regional center model can offer an immigrant investor already defined investment opportunities, thereby reducing the immigrant investor's responsibility to identify acceptable investment vehicles." USCIS Policy Manual, Volume 6, Part G, Chapter 3, https://www.uscis.gov/policy-manual/volume-6 (current as of June 6, 2019). With respect to the proof of capital at risk, direct investments and regional center investments have identical requirements. However, for the purpose of the job-creation requirement, direct investments and regional center investments have one important difference. Direct investment can only satisfy the job-creation requirement with the creation of direct jobs, i.e., new positions within the new commercial enterprise itself. For a petition filed on the basis of jobs already created, a petitioner submits relevant tax records, for example, documenting direct hires. 8 C.F.R. § 204.6(j)(4)(i)(A). By contrast, investments through regional centers allow EB-5 applicants to satisfy the job-creation requirement with either direct *or indirect* positions. An indirect job is one held outside of the new commercial enterprise but created as a result of the new commercial enterprise. An al-

ien who chooses to rely on such indirect, economic-impact-based employment must use an approved economic methodology to establish that the requisite number of jobs have been or will be created. *See id.* § 204.6(m)(7)(ii).[5] For a petitioner like Mr. Doe, who files on the basis of an enterprise *anticipated* to create the required number of jobs, his petition must include "[a] copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired." *Id.* § 204.6(j)(4)(i)(B).

The approval of an EB-5 visa petition results in the issuance of an immigrant visa and permits the alien to file for permanent resident status on a conditional basis. *See* 8 U.S.C. §§ 1255(a), 1186b(a)(1). Conditional residency lasts for two years. Ninety days before the expiration of the conditional residency, an alien may apply to have the conditions on residence removed and become a lawful permanent resident. 8 U.S.C. § 1186b(d)(2)(A). At that time, USCIS must reevaluate the alien's investment and ensure that the alien:

> (A) (i) invested, or is actively in the process of investing, the requisite capital; and

---

[5] The regulations allow that to demonstrate "indirect job creation," "reasonable methodologies may be used. Such methodologies may include multiplier tables, feasibility studies, analyses of foreign and domestic markets for the goods or services to be exported, and other economically or statistically valid forecasting devices which indicate the likelihood that the business will result in increased employment." 8 C.F.R. § 204.6(m)(7)(ii); *see also id.* § 204.6(m)(3)(v).

(ii) sustained the actions described in clause (i) throughout the period of the alien's residence in the United States; and

(B) is otherwise conforming to the require-ments of section 1153(b)(5) of this title.

8 U.S.C. § 1186b(d)(1); *see also* 8 C.F.R. § 216.6(a). The alien bears the burden of demonstrating that he satisfies all eligi-bility criteria by a preponderance of the evidence. *Matter of Chawathe*, 25 I. & N. Dec. 369, 375 (BIA 2010).

Mr. Doe successfully navigated each of the steps of this process until the final one, the petition to remove the condi-tions on his residence. In its consideration of that petition, USCIS identified two potential issues with respect to his ap-plication: whether his investment was sustained, at risk, through the duration of his residency, and whether the pro-ject would create the requisite number of jobs within a rea-sonable period of time. USCIS was required to engage in this inquiry and to consider the state of affairs as of the time of the final petition even though it previously had found the same requirements satisfied. *See* 8 C.F.R. § 216.6(c)(1).[6] Its resolution of these matters is the subject of Mr. Doe's appeal.

---

[6] 8 C.F.R. § 216.6(c)(1) provides, in relevant part, that the Director of USCIS must determine whether "[a] commercial enterprise was estab-lished by the alien" and whether "[t]he alien invested or was actively in the process of investing the requisite capital." In addition, the Director must find that "[t]he alien sustained the[se] actions … throughout the period of the alien's residence in the United States." *Id.*

**B.**

In 2011, Mr. Doe became one of twenty-four indirect immigrant investors in a proposed project to build Elgin Memory Care, Inc., a 110-unit assisted living facility in Elgin, Illinois. Each individual investor would contribute a minimum of $500,000 to be used for the project and, if additional statutory and regulatory requirements were satisfied, by virtue of their investment would become eligible for an EB-5 visa.

While Mr. Doe's initial capital investment was held in escrow, he self-petitioned for his EB-5 visa (the "I-526 petition"). His petition included a then-current business plan, which represented that, with the $12 million investment as the total project cost, construction of the facility would begin in 2010 and the facility would be operational by 2011. The plan also claimed that the project would create more than 270 full-time jobs. USCIS approved the I-526 petition in June 2011. One month later, Mr. Doe's $500,000 investment was transferred to Elgin Memory Care, and three days after the transfer, on August 1, 2011, Elgin Memory Care purchased a parcel of land on which it intended to build the assisted living facility. Elgin Memory Care paid $1.1 million for the land.

With an approved immigrant visa in hand, Mr. Doe was eligible to apply for adjustment of status.[7] His application for adjustment was approved in 2011, and he was granted conditional resident status for a two-year period. *See* 8 U.S.C. § 1186b. Approximately one month before the expiration of

---

[7] *See* 8 U.S.C. §§ 1186b(a)(1), 1201–02; 8 C.F.R. § 245.2.

his conditional residency in October 2013, Mr. Doe filed a petition to remove the conditions on his residence (the "I-829 petition"), as permitted by the statute.[8]

In response to his petition, in August 2014, Mr. Doe received the first indication that USCIS was beginning to have concerns about the investment that formed the basis of his visa: USCIS issued a thorough and detailed seven-page Request for Evidence to Mr. Doe. The Request sought further evidence that his investment satisfied two critical grounds of EB-5 eligibility, both significant to the disposition of the present appeal. First, the agency requested certain information to confirm that Mr. Doe's capital investment with the EB-5 Fund had been sustained throughout his two-year conditional residency period. In addition to seeking relevant financial documents and tax records that Mr. Doe had not provided, the Request specifically noted that, in searching a property records database, it had discovered something questionable about the land transaction that was the supposed purpose of Mr. Doe's capital investment. USCIS had learned that Elgin Memory Care purchased the parcel of land for $1.1 million from an entity called UIS Development, LLC, on the very same day that UIS itself had purchased the parcel from Nesler & Lake CRE, for nearly half the amount, $630,000. The Request gave examples of potential evidence to overcome deficiencies related to whether Mr. Doe's in-

---

[8] The period during which an alien may apply to remove conditions is the ninety-day period prior to the expiration of the conditional residency. 8 U.S.C. § 1186b(d)(2)(A).

vestment was placed "at risk," including an explanation of the prior sale "with supporting evidence."[9]

In addition to articulating the specific concerns about the land transaction funded with Mr. Doe's investment, the Request also raised potential issues about the evidence concerning job creation. The Request noted that, between the initial submissions in support of the visa and this most recent petition to remove conditions, Mr. Doe had revised his projected job-creation figures downward by nearly fifty percent without any explanation. Beyond the particular deficiencies identified, the Request reflects plainly a concern from the agency that the project had not met any of its projected benchmarks and that no updated timelines for completion and operation had been submitted. The agency requested that, in response to its concerns, Mr. Doe provide further information on whether the project remained a going concern and whether he had sustained his qualifying investment in it. It also sought information on revisions to the anticipated job creation, because the deadlines in the plan submitted had not been met by the project. It listed a series of documents that might help satisfy those requests and invited Mr. Doe to submit anything else relevant to these concerns. Mr. Doe responded to the Request with various additional documents, the sufficiency of which is relevant to this appeal.

On January 16, 2015, USCIS denied Mr. Doe's I-829 petition to remove the conditions on his residence. The nine-page denial letter cited two alternate and independent grounds for the decision: namely, the "at risk" ground, relat-

---

[9] Certified Administrative Record ("CAR") at 15 (R.32-1).

ed to the suspicious land transaction, and the "job-creation" ground, related to whether the project met the minimum statutory requirements for creating new full-time employment.

## C.

Mr. Doe brought this action in the district court, principally alleging that USCIS's denial of his application to remove the conditions on his residence was arbitrary and capricious. In 2016, the parties filed cross-motions for summary judgment. The district court granted the Government defendants' motion in a lengthy and thoughtful memorandum opinion and order. The court determined that the agency's action was grounded in the evidentiary record. *See* 5 U.S.C. § 706(2).

First, with respect to the requirement that the full amount of a capital investment be placed "at risk," the court noted that USCIS had reason to be "deeply concerned about the legitimacy of [the] land deal and whether [Mr. Doe]'s capital had, in fact, been used to support job creation activities by the assisted living facility."[10] The court recounted the documented facts of the transaction: that the investment was transferred from the regional center to Elgin Memory Care three days before the land transaction, but on the day of the transaction, an intermediate buyer was able to purchase the land for roughly half the price Elgin Memory Care would pay to that buyer later the same day. The court noted that the agency had asked Mr. Doe to provide evidence substantiating the legitimacy of the land deal in the Request for Evi-

---

[10] R.91 at 14.

dence and that he had provided only summary affidavits attesting to the deal's legitimacy and a lack of relationship between the seller, intermediate buyer, and ultimate buyer. As the court observed, *none* of these documents explained away the fact that the transaction was questionable on its face. Furthermore, the court held that USCIS was entitled to discount the affidavits because they were "self-serving," and "do little to shed any light on the wide disparity between" the two same-day purchase prices.[11] The court noted that Mr. Doe had failed to provide the sale documents from the first transaction, the terms of the deal, or an independent appraisal. The court found reasonable USCIS's rejection of Mr. Doe's contrary assertion—that the intermediate buyer was able to "flip" the property for a profit in a matter of hours.[12]

The district court then turned to the job-creation requirement. In response to Mr. Doe's objection that the agency's decision added a requirement that indirect jobs created by the entity must last longer than two years to be counted, the court concluded that Mr. Doe had misread the decision. In the court's view, when read in context, it was clear that the agency's reference to the duration of jobs created applied only to the *direct* jobs. With respect to the remaining *indirect* jobs, even if they all counted, the district court noted that they were fewer than the ten required.

The court also found no merit to Mr. Doe's objection that the agency had improperly rejected his employment impact

---

[11] *Id.*

[12] *Id.* at 15 (quoting CAR at 25).

report. It thought that there were numerous reasons to question the reliability of his expenditures, given that construction had not commenced. The court determined that there was no error in the agency's conclusion that Mr. Doe's impact report was unreliable in light of the totality of the evidence in the record. Finally, the court found no error in the agency's rejection of Mr. Doe's job-creation methodology. It concluded that Mr. Doe essentially disagreed with the agency's refusal to include certain expenditures in its calculations, but that, in any event, the exclusion of those expenditures was not arbitrary.

Mr. Doe appealed the district court's judgment. When his appeal was first before us, we discovered a conflict of interest with his attorney. Specifically, the attorney on the brief was the second member of a two-person law firm, and the principal attorney was under investigation for fraud in the EB-5 program. *See SEC v. Kameli*, No. 17-cv-04686 (N.D. Ill.). Kameli is accused of "defrauding at least 226 immigrant investors who participated in the EB-5 immigrant investor program. More specifically, the SEC alleges that Kameli solicited over $88 million to invest in a number of new commercial enterprises, only to squander and misappropriate some of those funds." *Doe v. Nielsen*, 883 F.3d 716, 718 (7th Cir. 2018) (citation omitted). The SEC complaint specifically identifies Elgin Memory Care as having been part of the scheme to defraud and sets forth specific allegations of misappropriation of the immigrant investors' capital. We ordered briefing on the subject of a potential conflict between the Kameli firm's continued representation of Mr. Doe, and we subsequently disqualified them from further representation. *Id.* at 720. We pause to emphasize that our discussion of the fraud accusations concerned only the qualifications of

prior counsel and his law firm to represent Mr. Doe before us in this proceeding. The allegations are not part of the administrative record in this case, and they have no bearing on our disposition of this appeal.

Now represented by new counsel, and supported by new briefing, the merits of Mr. Doe's appeal are before us.

## II.

## DISCUSSION

Our review of the district court's decision granting summary judgment is de novo. *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019).

Mr. Doe claims that USCIS's denial of the petition to remove the conditions on his residence is arbitrary or capricious and requests that this court therefore hold it unlawful. *See* 5 U.S.C. § 706(2)(A).

> When determining whether an agency's decision is arbitrary or capricious, we ask whether the agency
>
> > has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Zero Zone, Inc. v. United States Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). Furthermore,

> [t]he Administrative Procedure Act (the "APA") recognizes the importance of judicial review when it provides that agencies must explain the basis for their decisions, "on all material issues of fact, law, or discretion ... ." 5 U.S.C. § 557(c)(3)(A). The Supreme Court has instructed us to review agency decisions only on the basis of the reasons given in the agency's order or opinion. *Securities and Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943). "Even if the evidence in the record, combined with the reviewing court's understanding of the law, is enough to support the order, the court may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency." 3 K. Davis, Administrative Law Treatise § 14.29 at 128 (2d ed. 1980).

*Saylor v. United States Dep't of Agric.*, 723 F.2d 581, 582 (7th Cir. 1983) (parallel citations omitted).

In the present case, because USCIS's determination was based on two independent and alternative grounds, we would have to find error in both determinations in order to grant relief to Mr. Doe. *See BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) ("When an agency offers multiple grounds for a decision, we will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable."). We therefore consider whether the agency's decision may be sustained under either its at-risk or job-creation rationales.

First, Mr. Doe challenges USCIS's conclusion that he had not carried the burden to demonstrate that his capital investment was put "at risk" for the purpose of generating a return. Specifically, in its Request for Evidence, the agency noted that there were deficiencies in Mr. Doe's evidence regarding his contribution and its subsequent use. To begin, the agency faulted him for providing no evidence, in the form of a loan agreement or otherwise, that the funding entity released the funds to Elgin Memory Care. Next, although there was evidence that Elgin Memory Care had purchased a parcel of land for construction of the facility at a price of $1.1 million, that same property had been purchased earlier the same day by an intermediate buyer for the cost of only $630,000. The agency also noted the absence of later tax records and of "[u]naltered" financial statements by Elgin Memory Care.[13] To satisfy the requirement, USCIS requested a series of documents. Among them was "[a]n explanation, with supporting evidence, to explain the prior sale between" the first owner of the property and the intermediate buyer, as well as descriptions of any relationships between the parties to either of the sales.[14] Mr. Doe responded to the agency's Request for Evidence. Although he provided affidavits from the intermediate buyer and Mr. Doe's then-counsel, Kameli, on behalf of Elgin Memory Care, none provided an *explanation* of the first sale and how the property could have been "flipped" on the very same day.

---

[13] CAR at 14 (R.32-1). The financial statements Mr. Doe provided had blacked out virtually all information, save the $500,000 contribution from Mr. Doe. *See, e.g., id.* at 460 (R.32-9) (bank statement, with series of blank post-it notes covering all information except the contribution).

[14] *Id.* at 14 (R.32-1).

When it ultimately denied the petition, questions regarding the legitimacy of the land transaction were the principal basis for the agency's conclusion that the required amount of capital had not been shown to be "sustained" and "at risk."[15] The denial letter again noted the dubious details of the land deal, and then considered the evidence submitted in response to the Request for Evidence. It concluded that

> [t]he legitimacy of the transaction plays an important role in determining whether or not the EB-5 capital was truly made available to [Elgin Memory Care], as opposed to simply being used for purposes unrelated to job creation. In this case, the same-day land transaction and the doubling of the price cast doubt on the legitimacy of the transaction. Petitioner did not submit sufficient evidence to explain why the land was sold on the same day for double the price.[16]

It also stated that Mr. Doe had failed to submit objective evidence, such as an independent appraisal, that supports the

---

[15] The agency cited the seminal BIA precedent on "at risk" investments, *Matter of Izummi*, 22 I. & N. Dec. 169 (BIA 1998), for the proposition that the full amount of the investment must be made available to the job-creating entity. As Mr. Doe notes, the citation is of limited use; *Izummi* involved the question whether the investment may be used to pay lender fees associated with obtaining additional capital for the job-creating entity. *Id.* at 178–79. The question here is not whether some particular expenditure can be credited based on its type, but whether the transaction was questionable enough to suggest that it was not a legitimate purchase at all.

[16] CAR at 6 (R.32-1).

finding that the price Elgin Memory Care paid approximates market price. It discounted the sworn statements that the parties were unrelated under *Matter of Ho*, 19 I. & N. Dec. 582, 591–92 (BIA 1988), which required "independent objective evidence" to resolve credibility issues with the alien's own statement. The affidavit from the intermediate buyer, USCIS concluded, was insufficient to "assuage USCIS's concerns."[17]

As the district court noted, "[i]t is clear from the record that USCIS was deeply concerned about the legitimacy of [Elgin Memory Care]'s land deal and whether [Mr. Doe]'s capital had, in fact, been used to support job creation activities by the assisted living facility."[18] Mr. Doe makes various objections to this conclusion. He first complains that USCIS expanded the evidentiary requirements necessary to satisfy the statute. Next, he asserts that the agency relied on an "entirely unsupported[] hunch" to deny his claim.[19] He also claims that the denial failed to address the evidence he submitted. Finally, he contends that the denial improperly required him to "prove a negative," i.e., that the land deal did not run afoul of EB-5 policy.[20]

Mr. Doe readily acknowledges, at multiple points in his brief, that he bears the burden of proving eligibility by a preponderance of the evidence. Although his brief cites numerous specific objections to the USCIS determination, he

---

[17] *Id.*

[18] R.91 at 14.

[19] Appellant's Br. 13.

[20] *Id.* at 25.

leaves relatively untouched the basic concern of USCIS: two years after the initial petition was granted, the project had met none of the benchmarks identified in the most recent plans Mr. Doe had submitted. Indeed, it was so far behind schedule as to raise legitimate questions about whether the project ever would be completed. In that broader context,[21] USCIS reviewed Mr. Doe's application, in which he claimed that his capital investment had funded the purchase of property for the not-yet-built assisted living facility. USCIS's own review of the state's property database revealed *unusual* circumstances—an intermediate buyer able to own the property for less than one day and turn a tremendous profit by reselling it to Elgin Memory Care. That large, unexplained profit led USCIS to question whether the transaction was instead a maneuver to skim some of the money off of the investment, an action resulting in less of Mr. Doe's investment being placed "at risk" to create jobs through the new commercial enterprise.

We think the agency was entitled to conclude that Mr. Doe's response to the agency's concern failed to address adequately this broader and more fundamental question raised by USCIS. For example, Mr. Doe makes much of the fact that the denial repeatedly uses the term "double" to refer to the price paid by Elgin Memory Care relative to the price paid by the intermediate buyer. He correctly notes that, of the $1.1 million paid by Elgin Memory Care, $120,000 was

---

[21] The agency is both aware, and communicating to aliens, that fraud is a recurring problem in this visa category. *See* USCIS, *Investor Alert - Investment Scams Exploit Immigrant Investor Program*, https://www.uscis.gov/archive/investor-alert-investment-scams-exploit-immigrant-investor-program (last updated 10/2013).

held in escrow for street-related improvements. As a consequence, the profit made by the intermediate buyer was not $470,000, but $350,000, which is not "double" the amount paid. His objection, while technically correct, is immaterial: USCIS was not concerned with the exact percentage but with the fact that an ownership of only hours had turned such a significant, and therefore questionable, profit.

Notably, USCIS did not deny the claim immediately, but requested evidence to support the legitimacy of the transaction. *See* 8 C.F.R. § 216.6(c)(2).[22] It requested "[a]n explanation, with supporting evidence" of the prior land sale, and a description of the relationship between the parties to that sale and the principals of each.[23] As the district court noted, Mr. Doe's response gave no narrative explanation of how the intermediate buyer was able to acquire the property and turn a profit of several hundred thousand dollars with such speed. Similarly, Mr. Doe's quibbles about USCIS's treat-

---

[22] The regulations provide, in relevant part,

> If derogatory information is determined regarding any of these issues or it becomes known to the government that the entrepreneur obtained his or her investment funds through other than legal means (such as through the sale of illegal drugs), the director shall offer the alien entrepreneur the opportunity to rebut such information. If the alien entrepreneur fails to overcome such derogatory information or evidence the investment funds were obtained through other than legal means, the director may deny the petition, terminate the alien's permanent resident status, and issue an order to show cause.

8 C.F.R. § 216.6(c)(2).

[23] CAR at 14 (R.32-1).

ment of the affidavit of the intermediate buyer, which stated summarily that it had no relationship with any other party, miss the mark: the ultimate question is not whether USCIS had to credit that affidavit, but whether Mr. Doe established that his capital was fully available to Elgin Memory Care and legitimately used for purposes related to job creation.[24] Similarly, USCIS did not *require* a market analysis or the original purchase agreement on the property, but simply stated that Mr. Doe had *not* met his burden to establish that the transaction was legitimate. The statements of USCIS are best read as simply communicating that, even if Mr. Doe were unable to obtain information from the first seller and the intermediate buyer, he could have procured other kinds of evidence.

The Request for Evidence placed Mr. Doe on notice that USCIS had legitimate suspicions; he was unable to answer adequately those suspicions in the evidence he provided. The burden remained on Mr. Doe to establish that he met all of the requirements of the program, or, in the words of the regulation, "to overcome [the] derogatory information" that USCIS had considered. 8 C.F.R. § 216.6(c)(2). The denial of Mr. Doe's petition reflects nothing other than a recognition that his submissions in response to the Request for Evi-

---

[24] Indeed, the very case on which Mr. Doe relies, *Soltane v. United States Department of Justice*, 381 F.3d 143, 151 (3d Cir. 2004), states that "[a]n agency's rejection of uncontradicted testimony can support a finding of substantial evidence" when it provides adequate reasons. *Id.* (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1254 (11th Cir. 1983)). Here, USCIS did provide a specific reason for why the affidavit did not speak to its central concern: how the intermediate buyer was able to turn an astonishing profit in just hours of ownership.

dence—which had been specific both in its concerns and in its list of documents that might address those concerns—had failed to overcome contrary evidence. USCIS reasonably concluded, after questioning the single expenditure support-ed by Mr. Doe's investment, that significant questions re-mained unanswered about whether the transaction was le-gitimate and truly placed the full value of the investment "at risk" for purposes of job creation. Mr. Doe, who carried the burden to establish his eligibility, failed to dispel these con-cerns when given an opportunity. The district court there-fore did not err in its conclusion that USCIS's decision was not arbitrary or capricious with respect to the land transac-tion and whether Mr. Doe's investment was placed "at risk."[25]

### Conclusion

We affirm the judgment of the district court.

AFFIRMED

---

[25] Because we have concluded that the first basis relied upon by the dis-trict court to uphold the agency's decision was not in error, we need not consider whether the agency's alternative basis for denying Mr. Doe's petition also was a legally sufficient basis for denial. *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003).