NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 10, 2019
Decided July 22, 2019

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

AMY C. BARRETT, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 18-3215

| | |
|---|---|
| FRANCIS T. FOSTER,<br>    *Plaintiff-Appellant*,<br><br>    *v.*<br><br>PRINCIPAL LIFE INSURANCE<br>COMPANY,<br>    *Defendant-Appellee*. | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 13 C 3066<br><br>Rebecca R. Pallmeyer,<br>*Chief Judge*. |

**O R D E R**

Francis Foster served as counsel for several retirement plans for the employees of the Pace Suburban Bus Division, a mass transit system in Illinois. He sues Principal Life Insurance Company, the plans' paying agent, for intentional interference with a prospective economic advantage. Specifically, Foster contends Principal implemented an unauthorized stop-payment order against him, forcing him to resign before his intended retirement date. The district court denied the parties' cross-motions for summary judgment. In its order, the court also limited Foster's damages to unpaid fees before his resignation, ruling that Foster could not possibly establish Principal's liability for damages incurred after that intervening event. Foster later clarified that, because of

a prior settlement with Pace, he seeks only lost wages incurred after his resignation. He asked the district court to enter summary judgment for Principal and pursued this appeal. We affirm the judgment in Principal's favor.

## I. Background

The undisputed facts and the summary-judgment record tell the following story: For decades, Foster was counsel for several retirement plans for Pace employees. The terms of each plan (with one exception) establish administrative bodies known as "plan committees," composed of an equal number of members selected by Pace and by the employees' union. As part of their responsibilities, the plan committees—not Pace— have sole authority to hire and fire attorneys for the plans.

Meanwhile, five committees authorized Pace employee Joseph Ellyin, as "Plan Representative," to enter into "Service and Expense Agreements" with Principal. The agreements designate Principal as the "paying agent" in charge of meeting plan expenses—including Foster's legal fees. To authorize payments, the plan committees or their representative must give Principal written "Notice." Per its agreements, Principal may "rely conclusively on any Notice" and has no duty to inquire further.

In 2005, Principal received an email from Ellyin directing payment of Foster's fees at a fixed rate "until direction from [Ellyin] to the contrary." Foster then received regular payments from Principal until March 2011. Then things changed. That month, Ellyin sent another email to Principal, stating, "Effective immediately I need to approve all non-Principal invoices for the Pace's union plans." The parties agree this change was caused by a developing feud between Foster and Pace representatives. In January 2011, Foster had sent a letter to members of Pace's Board of Directors, informing them that one plan (which Principal did not service) was underfunded in violation of Illinois law. The Pace directors, apparently dissatisfied with Foster's scrutiny, then purported to fire him three times. Each time, however, Foster explained to the directors that the termination letters were invalid: only the plan committees, not Pace acting alone, could vote to fire him.

From March 2011 to July 2012, Ellyin and other Pace representatives instructed Principal not to pay Foster's invoices, though Foster continued to serve as counsel for the plans. Principal says its representatives did not know that the order was intended to deny Foster payment for his work, or that Pace and Foster were feuding. But, as Foster notes, he met with Principal employee Darnell Washington in May 2011 to explain that

the stop-payment order was invalid, and sent a follow-up letter to Principal the next month.

Washington notified Ellyin about Foster's letter and asked for instructions. He also forwarded the letter to Principal's compliance department, which—after reviewing plan documents and contacting plan representatives—concluded it needed direction from the plan committees. Principal mailed letters to all committee members but did not receive a response until September 2012.

By then, the conflict between Foster and Pace had resolved with a settlement: in exchange for Foster's resignation in September 2012, he would be paid his fees, in full, for work performed until that date. Once notified, Principal promptly paid all invoices.

Foster then sued Principal for tortious interference with a prospective economic advantage. He alleges Principal's payment delays compelled him to resign as attorney for the plans in 2012, well before his planned retirement dates in 2019 (for some plans) and 2022 (for others). The district court initially dismissed the suit on the pleadings, concluding that it was "derivative" of Foster's former lawsuit against Pace.

In Foster's first appeal, this court vacated that judgment and remanded the case, holding that Foster had adequately pleaded a tortious-interference claim. *See Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 974 (7th Cir. 2015). This court relied in part on Foster's assertion that he suffered damages in the form of harm to his professional reputation and a loss of income. *Id.*

On remand, both parties engaged in discovery and eventually moved for summary judgment. At first the district court denied the motions, concluding that material disputes remained as to whether Foster could prevail on a claim that Principal's meddling led to reputational harm or lost profits for completed work. But the court limited the available lost-income damages "to amounts, if any, that Foster has not yet been paid for work on behalf of the Plan Committees through July 2012." Principal, the court explained, could not be liable for Foster's expected profits after that date because it could not have been aware of Foster's expectation of continued work after his resignation, and it played no significant part in the skirmish that caused Foster's early resignation.

Later, at a status hearing in October 2018, Foster conceded that his settlement agreement with Pace had fully compensated him for damages incurred before his resignation. He clarified that in this case he was not seeking compensation for injury to

his professional reputation, nor was he seeking interest payments or other money associated with the delayed payments. Rather, he wanted compensation for the income stream he would have received if he had not resigned as counsel for the plans and had instead continued working until his anticipated retirement date. Because the district court had said Foster could not get to a jury on that theory of damages, the district court, at Foster's request, entered a final judgment against him so he could pursue this appeal.

## II. Discussion

This court reviews summary judgment de novo and may affirm on any ground that the record supports. *See St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019). Diversity jurisdiction exists on Foster's claim, for which Illinois law controls.

To establish a claim under Illinois law for intentional interference with a prospective economic advantage, a plaintiff must prove four elements: (1) a reasonable expectation of continuing (or entering into) a valid business relationship; (2) the defendant's knowledge of the expectation; (3) purposeful "interference" by the defendant that prevents the plaintiff's legitimate expectation from ripening; and (4) damages caused by the first three elements. *Voyles v. Sandia Mortg. Co.*, 751 N.E.2d 1126, 1133–34 (Ill. 2001) (quoting *Anderson v. Vanden Dorpel*, 667 N.E.2d 1296, 1299 (Ill. 1996)). An at-will employee may recover damages for tortious interference if the employer would have been sufficiently certain to continue the relationship absent the defendant's misconduct. *See Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991); *Cashman v. Shinn*, 441 N.E.2d 940, 944 (Ill. App. Ct. 1982).

Foster's claim falls apart at the first element. Illinois courts hold that an expectation of continued employment cannot exist unless both parties convey a willingness to continue the relationship. *See Chapman v. Crown Glass Corp.*, 557 N.E.2d 256, 266 (Ill. App. Ct. 1990); *see also Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 520 F. Supp. 2d 1012, 1022 (N.D. Ill. 2007) (reasonable expectation requires "more than the hope or opportunity of a future business relationship"). By the time Principal entered the conflict with the stop-payment order, Pace had already tried to fire Foster three times. Foster knew that half of each plan committee (the Pace-nominated half), and in one instance the entire committee (composed solely of Pace representatives), were likely arrayed against him long before Principal became involved. Thus, there was no expectation of continued employment left for Principal to obstruct. *See Cashman*, 441 N.E.2d at 944 (no employment expectancy when plaintiff was informed that board

members had decided to fire him if he did not resign); *see also Montes v. Cicero Pub. Sch. Dist. No. 99*, 141 F. Supp. 3d 885, 900 (N.D. Ill. 2015) (no business expectancy when plaintiff informed that her contract might not be renewed, despite history of renewals).

Foster presumes that because Principal wrongfully implemented Pace's unauthorized stop-payment order against him, he must be entitled to relief for that interference. He is mistaken. Foster must furnish evidence of all four elements to succeed on his intentional-interference claim. *See Voyles*, 751 N.E.2d at 1133–34. And, in any event, the record does not show that Principal committed "some impropriety" intending to interfere with Foster's business dealings. *See Romanek v. Connelly*, 753 N.E.2d 1062, 1073 (Ill. App. Ct. 2001). When Principal implemented Pace's stop-payment order, it was in a difficult situation: as the plans' paying agent, it had to decide whether to release Foster's payment based on contradictory orders from feuding parties. It ultimately made the reasonable decision to defer to its contractual obligations and follow the directions of the committee representative, who happened to be a Pace employee. *See Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1051 (Ill. App. Ct. 2010). Under those circumstances, no reasonable juror could find that Principal's decision was intended to sabotage Foster's relationship with the plans.

Nor did Principal's decision have that effect. Foster's business relationship (and any possible expected future income) ended because Foster voluntarily resigned as counsel for the plans. *See Cashman*, 441 N.E.2d at 944 (holding that voluntary resignation exterminates expectation of continued employment "as a matter of law"). Despite Foster's assertions to the contrary, he resigned voluntarily; the express provisions in the settlement agreement with Pace, Foster's resignation letters, and his own statements at a deposition and at oral argument of this appeal so demonstrate. Because Principal—who played no role in the settlement negotiations between Foster and Pace—could not have caused Foster's loss of future income, Foster cannot recover damages from Principal. *Cf. The Film & Tape Works, Inc. v. Junetwenty Films, Inc.*, 856 N.E.2d 612, 620 (Ill. App. Ct. 2006) (requiring interference to "actually induce" third party to terminate relationship with plaintiff).

Foster also observes that the settlement agreement with Pace did not operate as release of his claims against Principal. This suggests to him—even if he resigned as part of the settlement with Pace—that Principal cannot escape liability by invoking his resignation. But the question is not whether Foster "released" Principal in the settlement agreement, as Principal argued in the previous appeal. *See Foster*, 806 F.3d at 973. Rather, the question is whether Principal contributed to the resignation in a manner

that Illinois law would recognize as tortious interference. The answer to that question is "no."

Finally, Foster offers several arguments that require only brief discussion. He cites a case for the proposition that an entity that aids and abets a fraud is itself liable for the fraud. *See E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000). But his tortious-interference claim has not been litigated as a fraud claim, and no jury could reasonably find that Principal tried to help defraud him. Foster also insists that Principal had a fiduciary duty that bears on his claim, but the agreements between Principal and the plans explicitly provide that Principal has no fiduciary responsibilities, and there is no evidence that Principal had any duty to Foster. Foster also presses a "conspiracy" claim, but his argument is woefully underdeveloped and unsupported. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001). And his "conversion" theory, presented for the first time on appeal, was not preserved. *See Walker v. Groot*, 867 F.3d 799, 802 (7th Cir. 2017). Lastly, Foster insists that the Federal Rules of Evidence forbade the district court from considering his settlement agreement with Pace, yet Foster himself placed the settlement and his stipulated resignation at issue.

### III. Conclusion

For the foregoing reasons, the district court's judgment is AFFIRMED.